**EASTER HOUSE, an Illinois not-for-profit corporation, Plaintiff–Appellee,**

v.

**Thomas FELDER, Florence McGuire and Joan Satoloe, Defendants–Appellants.**

**No. 86–2164.**

United States Court of Appeals, Seventh Circuit.

Aug. 14, 1990.

James Figliulo, Foran, Wiss & Schultz, Chicago, Ill., for plaintiff-appellee.

Thomas A. Ioppolo, Asst. Atty. Gen., Office of Atty. Gen., Chicago, Ill., for defendants-appellants.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The *en banc* review which we undertake today constitutes the second of its sort for this case. Our original *en banc* decision in this case was *Easter House v. Felder*, 879 F.2d 1458 (7th Cir.1989). In that decision, we concluded that Easter House could not pursue a remedy under § 1983 for either of two alleged deprivations of property which purportedly resulted from actions taken by the appellants as employees of the Illinois Department of Children and Family Services. With regard to the first alleged deprivation, we held that *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and its progeny precluded the impo-

sition of § 1983 liability in that the appellants' conduct was "random and unauthorized" and adequate state law remedies provided all the process which was due under the fourteenth amendment. A second alleged deprivation of property was dismissed in that Easter House had not identified a property interest of which it had been deprived. That decision, however, has been vacated by the Supreme Court and remanded for reexamination in light of *Zinermon v. Burch,* — U.S. —, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). We have conducted that reexamination and conclude that our original *en banc* decision is consistent not only with the dictates of *Parratt v. Taylor,* but also with the holding in *Zinermon.* Accordingly, we modify our original *en banc* opinion to account for the Court's pronouncements in *Zinermon,* but reaffirm our previous disposition of these issues.

## I. BACKGROUND [1]

Easter House is a Chicago-based adoption agency, owned and operated by Seymour Kurtz and licensed by the Illinois Department of Children and Family Services ("DCFS"). This suit arises from a series of events involving (1) Easter House's application for a renewal license, (2) its Executive Director's decision to depart while the application was pending and open a rival adoption agency with a similar name, (3) the appellants' decisions, as DCFS employees, to delay action upon Easter House's renewal license and to expedite action upon the former director's application to start a new agency, and (4) the appellants' decision to order various investigations of Easter House's operating procedures approximately two years later. According to Easter House, the appellants' actions were taken under color of state law and deprived Easter House of identifiable constitutionally-protected property interests in violation of 42 U.S.C. § 1983. We will treat Easter House's claims as involving two separate

conspiracies and set forth the facts supporting each.

### A. *The Licensing Conspiracy*

Easter House alleged that the appellants conspired with Easter House's former Executive Director to deprive it of, among other things, its operating license. This conspiracy involved two separate and distinct prongs. First, Easter House alleged that the appellants acted improperly in delaying action upon Easter House's application for a renewal license. Second, Easter House contended that the appellants improperly granted a license to Easter House's former Executive Director in an expeditious manner. Easter House claimed that together these two courses of action resulted in a property deprivation in violation of § 1983.

#### 1. Easter House's Application for a Renewal License

Easter House's operating license was scheduled to expire on November 30, 1974. In late November, Easter House began preparing for renewal of that license. Joan Satoloe, a licensing representative assigned to the DCFS's Chicago office, prepared a relicensing study which recommended renewal of Easter House's license for the two-year period beginning December 1, 1974. This recommendation was forwarded to the DCFS's main office in Springfield, Illinois, where the final licensing decisions are made and the licenses ultimately issued.

While Easter House's license was pending, its Executive Director, Millicent Smith, decided to leave, apparently on less than amicable terms. On December 30, 1974, while Satoloe was on vacation, Smith met with Satoloe's immediate supervisor, Florence McGuire, the licensing supervisor for the DCFS's central district, to tell her of her plans to leave Easter House and start a new adoption agency.[2]

---

1. We largely adopt, with his consent, the facts set forth by Judge Cudahy in the original panel opinion as reported at 852 F.2d 901, 904–09 (7th Cir.1988).

2. According to Smith's testimony at trial, she had met with McGuire at least once prior to December 30, 1974, to discuss with McGuire her plans to leave Easter House. However, McGuire and the other appellants disputed

At that meeting, Smith described the reasons for her growing disenchantment with Easter House.[3] She informed McGuire that she had been planning to leave Easter House for some time, but had delayed her action until Kurtz, Easter House's owner, had left on a year-end vacation. Apparently, his absence would facilitate her ability to start a rival adoption agency called the Easter House Adoption Agency, Inc. ("Easter House II").[4] She told McGuire that she had decided to use a name closely resembling Easter House and to take Easter House's files[5] to ensure that her leaving would not deprive her of the rewards to which she felt entitled based upon her long tenure at Easter House.

After the meeting, McGuire called the DCFS's Springfield office to request a delay in the mailing of Easter House's renewed license. On the following day, December 31, 1974, Smith wrote to Satoloe and Thomas Felder, the chief of the DCFS for the central district. In that letter, she described the prior day's meeting and stressed the importance of rapid action upon Easter House II's charter application.

In a separate letter to McGuire, Smith indicated that Fran Riley, Easter House's only other trained social worker, had decided to leave Easter House and join Easter House II. Smith also thanked McGuire for withholding Easter House's license. On that same day, Smith wrote to Kurtz resigning her position at Easter House.

After discussing Easter House's situation with McGuire, Felder agreed with McGuire that Easter House's renewed license should remain on hold at the Springfield office. On January 6, 1975, Felder wrote to Kurtz, informing him that the departures of Smith and Riley, Easter House's only trained social workers, had put the agency out of compliance with the DCFS's licensing standards. *See* DCFS Regulation 5.10 (1970) (child welfare agencies must have at least one employee with a Master of Social Work degree and two years of supervisory experience in social work). He also stated that if Easter House wished to resume operations it would have to reattain minimum standards and reapply for a license.[6]

Smith's testimony, arguing that the DCFS had no knowledge of Smith's plans prior to the December 30 meeting.

3. The subjects discussed at the December 30, 1974, meeting are evidenced by a memorandum prepared by McGuire and sent to licensing representative Satoloe later that same day. The memorandum indicates that Smith detailed her past actions and future plans in the adoption business quite extensively.

For example, Smith purportedly stated that she had decided to leave Easter House because Seymour Kurtz, Easter House's owner-president, had altered his long-standing practice of delegating day-to-day management to Smith and had started to play a more active role. Smith also told McGuire that Easter House had brought several new people into the operation who answered to Kurtz rather than to her. She indicated that she was frustrated by her inability to halt practices of the new employees which she found objectionable, including careless handling of confidential adoption records and telephone solicitation of affluent former clients to increase the number of placements. Finally, Smith made vague allegations that Easter House was connected to foreign adoption agencies through which Kurtz had told Smith he expected "to make a million."

4. She told McGuire that her sister, Pacita Haire, already had signed the charter application for a

new agency, which Smith planned to own and operate. Smith apparently did not apply under her own name to avoid detection by Kurtz of her plan.

5. Smith told McGuire that she had removed all of Easter House's active case files and also indicated that she likewise planned to remove the closed files before Kurtz's return. All of the files were to be transferred to Easter House II which would allow the new agency to hit the ground running.

6. At trial, Felder testified that he withheld renewal of Easter House's license under authority of § 8(1) of the Illinois Child Care Act of 1969, 1969 Ill.Laws 105 (current version at Ill.Rev. Stat. ch. 23, ¶ 2218(1) (1986)). This provision authorized the DCFS to refuse to renew the license of an agency which "consistently fail[ed] to maintain the standards prescribed and published by the Department." However, Felder conceded during cross-examination that the suspension was inconsistent with the Illinois Child Act and with the DCFS's regulations and enforcement manual, which set forth various steps which the DCFS would take to bring a licensee into compliance with minimum standards before revoking or refusing to renew a license.

For example, § 7(c) of the Child Care Act, Ill.Rev.Stat. ch. 23, ¶ 2217(c) (1986), stated that

On January 8, 1975, upon the advice of a DCFS attorney, Felder wrote a second letter to Kurtz. In this letter, he informed Kurtz that the January 6th letter had been incorrect and that, pursuant to the Illinois Child Care Act of 1969, Easter House would have ten days from receipt of the second letter to request a hearing before the DCFS's refusal to issue a renewal license would become final. However, the second letter did not offer to provide the assistance required by the DCFS's regulations and enforcement manual. *See supra* note 6.

During the period between the decision to withhold renewal and Kurtz's response on January 22, 1975, the DCFS received two inquiries about the status of Easter House; one from a lawyer representing prospective clients and one from a social worker interested in applying for the position which Smith previously had held. Both callers were told that Easter House had no license. The DCFS further informed the prospective job applicant that the DCFS was in the process of reviewing Easter House's "entire program." In addition, Felder notified Judge Comerford, then the Chief Judge dealing with adoptions in Cook County, that Easter House was no longer licensed to make adoption placements.

Kurtz received both of Felder's letters on January 12, 1975. On January 22, Kurtz wrote the DCFS requesting a hearing and a written statement of charges. On February 4, two weeks after he had hired a new Executive Director, Kurtz met with Felder to discuss information which Kurtz had obtained about Smith's new operation and the relicensing of Easter House. At that meeting, Kurtz waived the hearing which had been offered in the January 8th letter after Felder assured him that the absence of proper staff was the only barrier to the issuance of Easter House's license. Soon

thereafter, Satoloe visited Easter House and approved the new Executive Director's credentials. On February 19, 1975, Easter House received its renewed license to operate as a child welfare agency during the period from December 1, 1974, through November 30, 1975—in effect, never losing its legal authority to operate as an adoption agency.

### 2. Easter House II's Charter Application

The alleged conspiracy to deprive Easter House of its license had a second part. Easter House contended below that the DCFS's actions in granting Smith's license for Easter House II were so irregular as to evidence the DCFS's intent to aid Smith in destroying Easter House.

In Illinois, child welfare agencies such as Easter House and Easter House II must apply to the Illinois Department of State for a charter which operates essentially as a certificate of incorporation. However, unlike ordinary corporations, child welfare agencies are subjected to charter studies by the DCFS in addition to the usual processing by the Illinois Department of State. According to testimony at trial, charter studies for child welfare agencies are intended to ensure that new agencies will serve the public interest. An ordinary DCFS charter study seeks to determine, among other things, whether an agency will serve a public need and whether the people forming the agency are reputable.

In addition to the charter application, which both the Department of State and the DCFS review, a child welfare agency must submit an application for an initial license directly to the DCFS. The DCFS investigation, undertaken prior to issuing a charter and initial license, does not differ significantly from the investigation performed in connection with license renewals.

the DCFS "shall offer consultation ... to assist applicants and licensees in meeting and maintaining minimum requirements." Section 5.02(II) of the Department's regulations state: "Reasonable efforts by the Department shall be made to assist a licensed child care facility to meet minimum standards. If, after such efforts, the facility fails to meet applicable standards, the license of such facility shall be revoked or not renewed." In addition, § 15 of the DCFS's enforcement manual also indicated that licenses should not be revoked or renewals withheld until state officials had met with the licensee to discuss inadequacies and provided ten to fourteen days for the correction of violations.

If the DCFS issues a license, either an initial license or a renewal license, it in effect certifies that the child welfare agency conforms with the DCFS's minimum standards.

Easter House II submitted a charter application to the Illinois Department of State on December 17, 1974. The application was forwarded to the appellants at the DCFS's Chicago office on January 2, 1975. On January 6, 1975, Easter House II submitted its license application to the DCFS. On February 6, 1975, the DCFS's Chicago office forwarded to its Springfield office a recommendation that a charter license be issued to Easter House II.

At trial, Easter House produced evidence that the DCFS's approval of Easter House

7. At trial, the appellants acknowledged that they had been concerned that the public would be confused by the similarity of the names for Smith and Kurtz's respective agencies. Furthermore, McGuire, Felder, and Smith all testified that they had attempted, without success, to dissuade Smith from using Easter House's name for this reason. However, Easter House II was approved by the Illinois Secretary of State as part of the chartering process and testimony showed that the DCFS's legal department believed that the DCFS lacked authority to block a charter or license based on this type of confusion.

The appellants' lack of active participation in a scheme to aid Smith in "stealing Easter House's business through theft of its name" is further evinced by the letter notifying Smith that her license had been approved. That letter indicated that the DCFS could not block her license on the basis of name confusion, but nonetheless warned Smith that use of Easter House II could result in legal action by Easter House.

8. Smith's removal of Easter House's files represented a more serious matter, since Easter House was unable to manage its cases, or to arrange for some other agency to manage its cases pending renewal of its license, without the information these files contained. In her letters to Kurtz and her testimony at trial, Smith claimed she had taken the files to preserve the confidentiality of the records and not to take Easter House's business. However, a contrary inference could be drawn from Smith's representations to McGuire that, in the words of McGuire's summary, Smith intended to enter into association with Kurtz in a way that would not "allow to go down the drain the eleven years of experience and hard work she had put into building up Easter House." At trial, Felder stated that DCFS had believed Smith's professions

II's charter and license application had been extremely irregular. First, it showed that the appellants knew of conduct by Smith that, at a minimum, cast doubt upon her fitness. For example, from their direct interactions with Smith and from complaints lodged by Kurtz, the appellants knew that (1) Smith had attempted (albeit unsuccessfully) to divert Easter House's mail and telephone calls to her new address, (2) she had insisted upon using a name confusingly similar to Easter House's despite warnings that the similarity could mislead the public,[7] (3) Smith had taken files from Easter House,[8] and (4) she attempted to place an adopted child with a couple, who believed they were still working with Easter House, before Easter House II was licensed.[9]

of concern about confidentiality and took the position that the return of the records was a matter strictly between Kurtz and Smith.

9. On February 3, 1975, Kurtz told Felder that he had spoken with a couple that had applied to Easter House for an adoption prior to Smith's departure. The couple, who had thought they were still dealing with Easter House, had received the baby from Smith and given Smith a check for $3,000.00. When they attempted to contact Smith later at Easter House, they spoke with Kurtz instead. When Felder confronted Smith with Kurtz's information, she initially denied any knowledge of the matter, but called back fifteen minutes later to admit that she had made the placement. Because the placement was legally invalid, payment on the check was stopped and a court proceeding was arranged to legalize the adoption. The appellants appear not to have considered this episode as relevant to Smith's fitness to run an adoption agency. Three days after this illegal placement came to light, before the adoption had been legalized, the DCFS's Chicago office recommended to Springfield that Smith's charter and license be approved.

The appellants point out that Felder brought Smith's action to the attention of the State's Attorney. However, Felder's letter reporting the matter seems to downplay the incident. The letter described the unlawful placement vaguely as "an apparent violation of the Child Care Act" and identifies the "primary informant" as Smith's former employer, suggesting that the allegation may be inaccurate. The letter also stressed that the adoption was subsequently legalized by the court and indicated that the DCFS subsequently saw fit to approve Smith's license. The letter does not mention that Smith apparently represented herself as an agent of Easter House to the adoptive parents and biological

Easter House also produced evidence that the charter and license studies were not conducted in accordance with normal procedures. For example, the jury heard evidence that the appellants may have fabricated certain aspects of the charter investigation. Furthermore, the appellants allegedly prepared the license study several days after deciding to approve Smith's application. Although the license study is undated, its text refers to a March 17, 1975, letter from the head of the DCFS to the Secretary of State, indicating that it was completed forty-one days after the Chicago office's recommendation had been sent to Springfield.

### B. *The Conspiracy to Harass*

Easter House also alleged below that the appellants participated in a second distinct conspiracy, a conspiracy to harass Easter House in violation of 42 U.S.C. § 1983. This conspiracy concerned the DCFS's investigation of Easter House's operations during 1976 and 1977, investigations undertaken long after the 1974 renewal license was granted.

At trial, Easter House offered evidence to prove that Felder and McGuire conducted an intensive investigation of Easter House, beginning in late 1976 with McGuire's review of Easter House's subsequent application to renew its license. Later, in early 1977, DCFS dispatched investigator Tom Howard to undertake a more thorough review.[10] At trial, Howard testified that upon three occasions he reported negative results to the appellants and offered his opinion that Easter House was operating legally. He further testified that upon each occasion the appellants instructed him to redouble his efforts to find evidence of wrongdoing.

mother or that she initially denied the incident to Felder.

Besides the letter's language, its timing also undercut its usefulness to the appellants. Felder sent the letter on March 20, 1975, more than six weeks after he first learned of the attempted placement, but only ten days after Felder and his superior and the DCFS's Springfield office received letters from an attorney inquiring upon Kurtz's behalf as to the DCFS's intended response to Smith's actions.

## II. DISCUSSION

The issues presented in this second *en banc* review are substantially the same as those we addressed in our original *en banc* decision. Specifically, we must address the arguments which raise the potential applicability of § 1983 to the alleged conspiratorial conduct. In so doing, we must determine: (1) whether the conduct complained of was committed by a person acting under color of state law; (2) whether these actions deprived Easter House of constitutionally protected property interests; and, (3) whether the alleged deprivation occurred without due process of law. *Parratt*, 451 U.S. at 535, 101 S.Ct. at 1913. We will address each issue in turn. In light of the Court's decision in *Zinermon*, the primary focus of our reexamination on remand is the scope of the *Parratt* rule and whether, after *Zinermon*, that rule still acts as a bar to § 1983 liability under these facts.

### A. *The Licensing Conspiracy*

The parties concede that the appellants' actions in processing the licensing applications submitted by Easter House and Smith were taken under color of state law. However, the appellants dispute Easter House's ability to satisfy the remaining inquiries dictated by *Parratt* and, most recently, *Zinermon*. Specifically, the appellants contend that Easter House cannot demonstrate that an actual deprivation of an identified property interest occurred. Moreover, even assuming that such a deprivation occurred, the appellants believe that Easter House received all of the due process protection which *Parratt* and *Zinermon* contemplate.

**10.** Howard conducted a "pretextual investigation" in which another investigator posed as a prospective parent. Howard also undertook a thorough review of Easter House's files with particular emphasis upon Easter House's dealings with Kurtz's foreign connections, apparently the foreign connections from which, according to Smith two years earlier, Kurtz planned "to make a million."

### 1. Deprivation of a Property Interest

■ Whether Easter House can identify a property interest of which it was deprived is a difficult question.[11] Property, for purposes of the due process clause of the fourteenth amendment, is "a legitimate claim of entitlement." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A claim of entitlement is "defined by existing rules or understandings that stem from an independent source such as state law." *Id.* The statutory and regulatory limitations upon the DCFS's authority to deny license renewals to child welfare agencies created such a legitimate claim of entitlement. *See* 1969 Ill.Laws 104–105 (current version as amended at Ill.Rev.Stat. ch. 23, ¶¶ 2218–2219 (1988)); *see also generally Reed v. Village of Shorewood*, 704 F.2d 943, 948–49 (7th Cir.1983). Thus, we conclude that Easter House had a property interest in the renewal of its license.

However, the issue remains whether Easter House ever suffered a deprivation of that identified property interest. Apparently, agencies with renewal applications pending do not need to have a current license in hand to operate. Furthermore, although Easter House's license expired November 31, 1974, Easter House never curtailed any aspect of its operations prior to Smith's departure at the end of December. More importantly, the DCFS never indicated that it considered Easter House's interim operation improper.[12]

Easter House argues that the January 6th letter from Felder to Easter House could be interpreted as an order that Easter House cease operations under § 9(b) which would constitute an actual deprivation of its license. That letter informed Easter House that it would have "to make reapplications for license and to meet licensing standards for a child welfare agency" before it could resume operations. Easter House further argues that its reading of the letters is supported by the DCFS's January 10th letter to Judge Comerford advising him that Easter House was no longer licensed and the appellants' statements to the prospective job applicant and prospective adoptive parents who inquired about Easter House's status.

The appellants respond that Easter House misreads the January 6th letter or at least improperly attempts to read the letter without considering the surrounding facts and circumstances. They point out that Easter House did not receive the letter until January 21, the same date it received the January 8th letter which granted it ten days to request a hearing before denial of its application for renewal would become final. Thus, the January 8th letter could be viewed as having acknowledged Easter House's right to interim operating status—a status which, under the statute, the DCFS could revoke only after holding a formal hearing, reaching a decision adverse to Easter House, and either issuing an order requiring immediate termination of operations or obtaining a court order affirming its determination.

---

**11.** The jury instructions identified four forms of property which the jury could find the defendants to have deprived Easter House of without due process of law:

(1) Its child welfare agency license; (2) Records and files related to expectant mothers under its care, records and files relating to applicants and prospective adoptive parents, and ... records and files relating to various organizations involved in the adoption field ... that may be a source for babies in need of adoption; (3) Reasonable expectations that Easter House's applicants or prospective adoptive parents may ... [obtain] a child from Easter House or have ... a home study [conducted] by Easter House; and (4) The legal right to the exclusive use of the name

Easter House in connection with an adoption agency in Illinois.

**12.** Such interim practice was supported, if not explicitly authorized at that time, by § 9(b) of the Child Care Act, which allowed agencies to continue to operate pending judicial review of a DCFS decision to revoke, suspend, or withhold renewal of a license unless the DCFS issued an order "directing that the operation of the facility terminate immediately." 1969 Ill.Laws 106 (current version as amended at Ill.Rev.Stat. ch. 23, ¶ 2219(b) (1988)). Thus, if agencies could continue operations even after an administrative determination that they should not be relicensed, it would seem unreasonable to require them to cease operation while an administrative determination was pending.

Fortunately, we need not resolve this issue definitively. We are not wholly convinced that a deprivation of constitutional magnitude occurred in light of the DCFS's January 8th letter granting Easter House an opportunity to request a predeprivation hearing. Nevertheless, because the appellants may have undercut the value of Easter House's "legal license" by their communications both with Judge Comerford and the potential employees and adoptive parents, we will assume that such a deprivation occurred. This assumption, however, does not resolve the issue of liability, for we must now determine whether the principles announced by the Court in *Parratt*, and applied in *Zinermon*, preclude an award of damages under § 1983.

## 2. Due Process Guarantees After *Parratt*

In our original *en banc* decision, we concluded that Easter House could not maintain a § 1983 action to recover damages for the alleged deprivations of property because it had received all the process which was due under the fourteenth amendment. Our decision was premised upon the Supreme Court's decisions in *Parratt* and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194 (1984) which hold that deprivations of property resulting from "random and unauthorized" acts of state actors do not constitute a violation of the procedural requirements of the fourteenth amendment due process clause if a meaningful post-deprivation remedy for the loss is available. We again review this rationale having in mind its application in *Zinermon*. We begin our analysis by briefly reviewing the relevant Supreme Court authority spawned by *Parratt*.

### a. *Parratt—Logan—Hudson—Zinermon*

In *Parratt*, a prisoner brought a § 1983 action against state prison officials alleging that their negligent loss of his mail-ordered hobby kit deprived him of property without due process of law in violation of the fourteenth amendment. The Supreme Court disagreed, noting that nothing in the fourteenth amendment protects against all deprivations of life, liberty, or property, but rather, prohibits only those deprivations which occur without due process of law. 451 U.S. at 537, 101 S.Ct. at 1914. The Court then rejected the proposition that a state is always required to provide a hearing prior to a deprivation. 451 U.S. at 540, 101 S.Ct. at 1915. The Court stated:

> either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking ... satisf[ies] the requirements of procedural due process.

451 U.S. at 539, 101 S.Ct. at 1915 (footnote omitted).

The Court noted that the state had promulgated predeprivation procedures which were adequate to protect the plaintiff's property interests, but that the state employee failed to follow the established policy. 451 U.S. at 543, 101 S.Ct. at 1917. The Court concluded that situations "involving a tortious loss of ... property as a result of a random and unauthorized act by a state employee", which by definition is not a loss resulting from some "established state procedure", are beyond the state's control and cannot be predicted. 451 U.S. at 541, 101 S.Ct. at 1916. The Court consequently held that negligent deprivations which occur without a prior hearing do not violate the fourteenth amendment's due process clause as long as the state provides a "meaningful post-deprivation remedy." 451 U.S. at 544, 101 S.Ct. at 1917. To hold otherwise, the Court opined, would "result in turning every alleged injury which may have been inflicted by a state official acting under 'color of state law' into a violation of the Fourteenth Amendment under § 1983, ... [and] 'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" 451 U.S. at 544, 101 S.Ct. at 1917 (citations omitted).

The Court reaffirmed the *Parratt* rationale in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265

**1397**

(1982). In *Logan*, a plaintiff filed a timely charge of unlawful conduct with a state employment commission. According to state law, the commission then had 120 days in which to convene a fact-finding conference. Through the commission's inadvertence, however, the plaintiff's hearing was scheduled five days beyond the jurisdictional deadline. The commission thereafter refused to consider the claim. Concluding that the plaintiff's complaint was directed not at the commission's error, but rather at an inadequate "established state procedure", the Court held that *Parratt* did not bar his § 1983 action. The Court stated that the established state procedure "destroys his entitlement without according him proper procedural safeguards." 455 U.S. at 436, 102 S.Ct. at 1158. Contrasting this with the situation presented in *Parratt* in which a state agent had failed to follow adequate state procedures, the Court noted, "it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference...." *Id.*

In *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court extended *Parratt* to cover the random and unauthorized "intentional conduct" of state employees. In that case, a federal inmate brought a § 1983 action against a correctional officer alleging a deprivation of property without due process of law. During a shakedown of the plaintiff's cell, the officer destroyed certain non-contraband personal items belonging to plaintiff. Reasoning that "a state can no more anticipate and control in advance the random and unauthorized conduct of its employees than it can anticipate similar negligent conduct", *Hudson*, 468 U.S. at 533, 104 S.Ct. at 3203, the Court found that the officer's intentional conduct fell within the *Parratt* doctrine. In so concluding, the Court rejected an argument that "because an agent of the state who intends to deprive a person of his property 'can provide predeprivation process, then as a matter of due process he must do so.'" 468 U.S. at 534, 104 S.Ct. at 3204 (emphasis in original). Reaffirming its adherence to the principles adopted in

*Parratt*, the Court stated the "controlling inquiry is solely whether the state is in a position to provide for predeprivation process." *Id.*

The Court's latest pronouncement on this issue came in *Zinermon v. Burch*. In *Zinermon*, the plaintiff alleged that the staff members at the Florida State Hospital had deprived him of his liberty without due process of law by admitting him to the hospital under a "voluntary" statutory procedure when they knew or should have known that he was not "competent" to sign the admission forms as was expressly required by that statutory procedure. The Court held that the district court's grant of a Rule 12(b)(6) motion in favor of the hospital staff was improper in that the factual circumstance which was presented did not fall within that category of cases in which *Parratt* and *Hudson* should preclude § 1983 liability. According to the Court, "*Parratt* and *Hudson* represent a special case of the general *Mathews v. Eldridge* [424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)] analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." —— U.S. at ——, 110 S.Ct. at 985. Thus, in concluding that *Parratt* should not be applied to preclude the imposition of § 1983 liability under the facts presented for review, the Court did not abandon the principles established by *Parratt* and *Hudson*. Indeed, the Court's determination in *Zinermon* that § 1983 liability may lie was premised on its conclusion that the deprivation which occurred under the Florida statutory scheme for mental health commitment was not "random and unauthorized" as those terms had previously been construed in *Parratt* and *Hudson*. Specifically, the Court focused on the "predictable" nature of the deprivation which was at issue and the extent to which additional predeprivation procedural safeguards could, under the Florida statutory scheme, possibly prevent that type of deprivation from recurring in the future. *Id.* —— U.S. at ——, 110 S.Ct. at 987–90.

### b. *Application of the Parratt–Hudson–Zinermon Formulation*

The question presented for our review in light of the Court's decision in *Zinermon*, therefore, is whether the appellants' conduct may still be characterized as "random and unauthorized" such that *Parratt* will preclude an award of § 1983 liability. As it has consistently argued in all proceedings leading up to our present review, Easter House maintains that the appellants' conduct should not be so characterized. Specifically, Easter House argues that *Zinermon* has now made it clear that *Parratt* does not preclude an award of § 1983 damages in cases, such as this, where the property deprivation results from the action of "high-level state and local officials" who are "engaged in a conspiracy to violate a citizen's constitutional rights." As framed, the argument which Easter House raises has three subparts: (1) that *Parratt* and its progeny are limited to minor deprivations of property; (2) that an "intentional conspiracy" can never be characterized as "a random act"; and (3) that the failure of high-level state employees, who are charged with providing the state's established due process protections, to grant admittedly practicable predeprivation relief automatically translates into an "established state procedure" and thus is *per se* "authorized". Finally, Easter House suggests that, even assuming that the appellants' conduct may be characterized as random and unauthorized, no meaningful postdeprivation remedies exist to provide the requisite due process protection. We will address each of these arguments separately.

### i. *Minor -vs- Substantial Deprivations of Property*

■ Easter House's attempt to limit the application of *Parratt* according to the magnitude of the deprivation at issue is directly refuted by the Supreme Court in *Zinermon*. Addressing the continued vitality of *Parratt* in certain factual circumstances, the Court stated:

> *Parratt* is not an exception to the *Mathews* balancing test, but rather an applica-

tion of that test to the unusual case in which one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue. Therefore, *no matter how significant the private interest at stake and the risk of its erroneous deprivation,* see *Mathews,* 424 U.S., at 335, 96 S.Ct., at 903, the State cannot be required constitutionally to do the impossible by providing predeprivation process.

— U.S. at ——, 110 S.Ct. at 985 (emphasis added). In light of this language, we reject Easter House's arguments to the contrary.

### ii. *Conspiracies as Random and Unauthorized Conduct*

■ Easter House next contends that because the appellants' actions were undertaken as part of a conspiracy to deprive it of constitutionally protected rights, their conduct cannot be characterized as "random" under *Parratt*. While the Court's decision in *Zinermon* does not address this issue, Easter House does find support for this proposition in *Bretz v. Kelman,* 773 F.2d 1026 (9th Cir.1985) (*en banc*) and *Labov v. Lalley,* 809 F.2d 220 (3d Cir.1987).

The court in *Bretz* was presented with a plaintiff's allegation that certain government officials had conspired to arrest and try him upon false burglary charges. The court reversed the Rule 12(b)(6) dismissal of his claim concluding that *Parratt* was not applicable to this allegation of conspiratorial conduct. The court stated, "[b]y definition, a conspiracy ... cannot be a random act, even if it was accomplished without the endorsement of the state governmental apparatus." 773 F.2d at 1031. In like manner, the third circuit in *Labov* considered a complaint which pleaded a conspiracy to deprive the plaintiff of "substantive liberty interests under the first amendment." The court agreed with the *Bretz* court's holding, stating that *Parratt* and subsequent cases "do not apply to charges of intentional conspiratorial conduct under color of state law. Such conduct, if it can be proved, is not the kind of isolated, unpredictable, and thus unpreventable con-

duct with which the Supreme Court purports to deal in the *Parratt v. Taylor* line of cases." 809 F.2d at 223 (citing *Davidson v. O'Lone*, 752 F.2d 817, 828 (3d Cir. 1984), *aff'd sub nom. Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)).

In contrast, the Fifth and Sixth Circuit Courts of Appeal have rejected the *Bretz* court's *per se* conspiracy rule. In *Holloway v. Walker*, 790 F.2d 1170 (5th Cir.), *cert. denied*, 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 576 (1986), the court held that a conspiracy may in fact be a random act if, "[f]rom the point of view of the state[,] ... the state cannot anticipate or control such conduct in advance." 790 F.2d at 1172 (citing *Hudson*, 468 U.S. at 533, 104 S.Ct. at 3203). The court reasoned, "[o]f course, a conspiracy is not random from the point of view of the conspirators but this is to say no more than that a conspiracy is an intentional act, rather than a negligent one. The effect of the Ninth Circuit's holding is to revive the intentional/negligent act distinction, rejected in *Hudson*, in another form." *Id.* Similarly, in *National Communication Sys., Inc. v. Michigan Public Service Comm'n*, 789 F.2d 370, 372–73 (6th Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986), the court rejected a *per se* conspiracy rule, reasoning that a conspiracy allegation merely raises the possibility of "intentional" as opposed to "negligent" conduct; a possibility which the Supreme Court's decision in *Hudson v. Palmer* advises is of no consequence in determining whether *Parratt* should apply.

The concern of the Court in this context since the decision in *Parratt* has been to determine whether the risk of deprivation was such that the state could predict when a deprivation might occur and, more importantly, protect against such an occurrence through the implementation of additional predeprivation process. These fundamental areas of concern have not been discarded in *Zinermon*. Indeed the Court's determination in *Zinermon* that *Parratt* was inapplicable was based, in part, on its conclusion that the deprivation which occurred was not only "authorized", but also predictable and capable of being avoided in the future through the implementation of additional predeprivation procedural safeguards. In this regard, to the extent a "conspiracy" is intentional (as we agree it must be by definition), "intentional acts are even more difficult to anticipate because one bent on intentionally depriving a person of his property might well take affirmative steps to avoid signalling his intent." *Hudson*, 468 U.S. at 533, 104 S.Ct. at 3203–04. To recognize that something is a "conspiracy" in this context is simply to recognize, as did the fifth and sixth circuits, that it is intentional. In light of the Court's decision in *Hudson* counseling that *Parratt* does indeed apply to "intentional" conduct, and in the absence of any indication to the contrary in *Zinermon*, we reject Easter House's reliance upon an absolute rule that a conspiracy is *per se* non-random conduct.

■ Nevertheless, Easter House believes that because the alleged licensing conspiracy had two separate prongs—the renewal application and the Easter House II charter application—the conspiracy involved multiple acts which, even under a traditional *Parratt* inquiry, take the conspiracy outside the realm of random. However, from the state's perspective, this characterization of the alleged scheme is inaccurate. Both prongs of the single conspiracy operated simultaneously. The state had no opportunity to discover that the appellants were disregarding the established state procedures for renewing licenses and granting charter applications.

Easter House cannot demonstrate that the appellants' actions, even if involving a conspiracy to destroy Easter House, were anything but a single instance of improper conduct involving multiple employees engaged in a single scheme for a relatively short period of time. The licensing conspiracy remains nothing more than a random decision of state employees to disregard state policy and procedure which resulted in injuries to Easter House. As a result, Easter House has failed to demonstrate how the existence of a conspiracy removes this case from the dictates of *Parratt*.

### iii. *Employee Status and the Definition of Random and Unauthorized Conduct*

 Does the appellants' status as "high level state employees or officials" render the principles established in *Parratt* inapplicable? In its original presentation to this *en banc* court, Easter House advocated an affirmative answer to this question. We answered in the negative. Armed with *Zinermon*, Easter House again advocates an affirmative response. While we acknowledge that *Zinermon* narrowed the scope of *Parratt's* application in certain factual circumstances, we do not believe that *Zinermon* creates a *per se* "employee-status" exception to *Parratt.* Accordingly, we again respond in the negative.

Initially we note that the phrase "random and unauthorized", as it has been employed since the decision in *Parratt,* can be interpreted both narrowly and broadly. *See Matthiessen v. Board of Educ.,* 857 F.2d 404 (7th Cir.1988); *Wilson v. Civil Town of Clayton,* 839 F.2d 375 (7th Cir. 1988); *Tavarez v. O'Malley,* 826 F.2d 671 (7th Cir.1987). Indeed, the Court in *Zinermon,* —— U.S. at ——, 110 S.Ct. at 978 and n. 2, takes cognizance of the split which has developed in the circuits over this issue and seeks to resolve the conflict. The ultimate disposition of the *Parratt* issue in *Zinermon* hints that a "narrow" application of the *Parratt* rule may be the appropriate course. It is apparent from the Court's rationale, however, that the dispositive factor in determining whether *Parratt* will indeed apply in a given situation is still whether the state actor's conduct is "random and unauthorized" or, as the Court has rephrased it, whether the state actor's conduct is "predictable and authorized".

The question of whether a state official ranks "high" or "low" in the state hierarchy, while possibly relevant as indicia of the discretion which that official exercises, cannot by itself be dispositive of this determination. The question of "predictability" —i.e., the question of whether a state actor's conduct can be deemed "random"

from the point of view of the state—does not turn simply on whether that official exercises a certain degree of discretion. Rather, we believe that there must be a second ingredient in the "predictability" equation which focuses on the extent to which the state official's discretion is "uncircumscribed". Indeed, this appears to have been a decisive factor permitting the majority in *Zinermon* to rule that *Parratt* would not preclude the imposition of § 1983 liability. In *Zinermon,* the majority framed the plaintiff's allegation as an attempt "to hold state officials accountable for their abuse of broadly delegated, uncircumscribed power to effect the deprivation at issue." —— U.S. at ——, 110 S.Ct. at 989. Concentrating on the question of "predictability", we can envision a scenario where a high-ranking state official does exercise the authority and discretion to effect a deprivation, yet that discretion is "circumscribed" by statutory or other predeprivation procedural safeguards. In such a scenario, an abuse of that discretion, while possibly causing a deprivation of property, would not necessarily be "predictable" from the point of view of the state and, according to *Parratt* and *Zinermon,* not compensable under § 1983. For these reasons, we reject Easter House's contention that there is a *per se* exception to the application of *Parratt* in situations where the state actor occupies a "high ranking" position in the state hierarchy.

 The Court in *Zinermon* was presented with a § 1983 claim premised upon a deprivation of liberty which resulted from the "voluntary" admission of the plaintiff to a mental health facility at a time when he was arguably not competent to give "knowing and informed consent" to his admission. In Florida, the provisions under which a person may be admitted to a mental health facility are embodied in a comprehensive statutory scheme. Not surprisingly, an incompetent person could not be admitted as a "voluntary" patient under those provisions.[13] The statute, however,

---

**13.** Under the Florida statutory scheme as it existed at the time of the alleged deprivation, a

mental hospital could admit for treatment any adult showing evidence of a mental disease who

did not direct any doctor at the mental health facility to determine whether a person being "voluntarily" admitted was in fact competent to give the necessary consent. Nor did the statute direct any official to initiate the "involuntary" admission procedure for those patients thought to be incompetent. Thus, as the Supreme Court found, the statute gave the officials at the mental health facility broad discretion in admitting patients under the provisions of the statutory scheme, but did not provide for procedural safeguards necessary to protect against any potential abuse of that discretion. — U.S. at —, 110 S.Ct. at 988. Based on this statutory oversight, the majority concluded that *Parratt* was inapplicable. Specifically, the Court found that the risk of exactly the type of liberty deprivation which occurred was entirely "predictable" and, more importantly, that such a deprivation would occur, if at all, at a specific predictable point during the mental health admissions process. *Id.* — U.S. at —, 110 S.Ct. at 989. In addition, the Court found that the case was distinguishable from *Parratt* in that the addition of "predeprivation process" was not impossible here as it was found to be in *Parratt. Id.* Finally, the Court concluded that the actions of the doctors could not be characterized as "unauthorized" in light of the authority they were given to effect the very deprivation complained of by the plaintiff. *Id.*

The Court's concern in *Zinermon* focused on the broadly delegated authority which the state statute gave the doctors to effect the deprivation at issue and the subsequent failure of that same statute to provide for effective pre-deprivation safeguards. It was in view of this statutory oversight that the Court concluded that the deprivation which occurred was "predictable" and, as such, not "random". In contrast, the Illinois statutory and regulatory scheme which we readdress today does not raise these same concerns. Although the appellants did exercise a certain amount of

discretion and authority over the failure or success of renewal applications, that discretion was not "uncircumscribed" or otherwise unregulated. Speaking in general terms, the deprivation of property which Easter House has alleged in the licensing conspiracy was not one that the state could have predicted or, more importantly, prevented through the implementation of additional predeprivation procedural safeguards.

To the extent Easter House was deprived of property, it was the result of a letter dated January 6, 1975, in which a DCFS official informed Easter House that it was out of compliance with DCFS licensing standards and would have to reattain minimum standards and "reapply" if it wished to resume operations. The content of this letter—i.e., the DCFS official's statement that Easter House would have to "reapply" if it wished to resume operations—was patently inconsistent with Illinois law and constituted an outright departure from the authority which the DCFS official was granted under the governing statutes and regulations. As we have previously noted, the DCFS official did not have the discretionary authority to revoke Easter House's interim operating status without proceeding through a series of procedural safeguards which included the holding of a formal predeprivation hearing. Moreover, Easter House points to nothing which would indicate that the state knew or should have known that the appellants or other state employees had disregarded, or were likely to disregard the state's established procedure for processing renewal applications. *See Katz v. Klehammer*, 902 F.2d 204, 207 and n. 1 (2d Cir.1990) (denying § 1983 liability, court distinguishes *Zinermon* on the fact that the deprivation alleged resulted from the defendants' violations of various laws and regulations governing their activities). In this sense, the DCFS officials' actions were not "predictable"; or, in contrast to the situation presented to the Court in *Zinermon*, the

---

"made application by express and informed consent." Fla.Stat. § 394.465(1)(a). The statute defines "express and informed consent" as "consent voluntarily given in writing after sufficient

explanation and disclosure ... to enable the person ... to make a knowing and willful decision...." § 394.455(22).

officials' actions here did not constitute an "abuse of ... broadly delegated, uncircumscribed power to effect the deprivation at issue." —— U.S. at ——, 110 S.Ct. at 989.

Nor do we believe the actions of the DCFS official in this case were "authorized" as that term is construed in *Zinermon*. Discussing the breadth of the term "unauthorized", the *Zinermon* Court focused on the extent to which the Florida officials were given not only the statutory power and authority to effect the deprivation complained of, but also the concomitant duty to initiate the procedural safeguards established by state law to guard against the risk of that deprivation. The Court noted that certain professionals on the staff at the Florida Mental Hospital were the *"only* persons in a position to take notice of any misuse of the voluntary admissions process, and to ensure that the proper procedure is followed." *Id.* at ——, 110 S.Ct. at 988 (emphasis in original). The actions of the DCFS officials were not "authorized" in this sense. Although certain DCFS officials did have the authority to deny renewal applications *after holding a formal hearing*, those same DCFS officials did not have the duty to initiate those pre-deprivation safeguards. Rather, the responsibility to initiate the procedural safeguards rested with the party aggrieved by the preliminary DCFS decision—in this case, Easter House. Thus, although the deprivation alleged did arguably occur at the hands of a "high ranking official", it is clear that it was not the result of that official's "abuse of ... broadly delegated, uncircumscribed power to effect the deprivation at issue." —— U.S. at ——, 110 S.Ct. at 989. Thus, we cannot conclude that the deprivation was "authorized".

■ In sum, Justice Blackmun has articulated in *Zinermon* a factual circumstance under which the majority has concluded that *Parratt* and *Hudson* are inapplicable. As we have pointed out, we believe the linchpin of the Court's analysis in *Zinermon* is the extent to which the conduct of the Florida state actors was not only "authorized", but also, under the circumstances of that case, highly "predictable".

In its most fundamental form, we believe *Zinermon* holds only that predictable deprivations of liberty or property which flow from authorized conduct are compensable under § 1983. The conduct which is presented for our review does not fall into that category.

■ In a related argument, Easter House argues that the fact of "employment status" may be relevant in determining whether a state employee's action can be deemed an "established state procedure", thus removing that action from the realm of "random" or "unpredictable". Specifically, Easter House asserts that "the single act of a sufficiently high-ranking policymaker may equate with or be deemed established state procedure...." *See, e.g., Matthiessen*, 857 F.2d at 407 n. 3; *Tavarez*, 826 F.2d at 677; *see also Dwyer v. Regan*, 777 F.2d 825, 832–33 (2d Cir.1985); *Stana v. School Dist. of City of Pittsburgh*, 775 F.2d 122, 130 (3d Cir.1985); *Bretz*, 773 F.2d at 1031; *Fetner v. City of Roanoke*, 813 F.2d 1183, 1185 (11th Cir.1987). Easter House contends that the appellants qualify as sufficiently high-placed policymakers whose alleged improper conduct constitutes an inadequate "established state procedure" under *Logan*, thereby precluding the application of *Parratt*, even though the conduct contravened formal state policy and procedure as expressed in written statutes, regulations, and procedural manuals.

We do not disagree that the acts of a state employee may be attributable to the state. However, in the *Parratt* analysis, this means nothing more than an employee acts under color of state law during the performance of his job-related duties. The issue is whether a single act of employee misconduct, which clearly contravenes established state policy and procedure as contained within formal rules, regulations, and statutes, automatically becomes the state's new position in all similar matters or whether the act, when viewed from the state's perspective, is merely a "random and unauthorized" deviation.

Without a doubt, the employee's position in the governmental hierarchy is relevant to this inquiry. For example, consider a

variety of situations in which a state's policy and procedures in a given area are delegated to a specified policymaker, be it a single person, a committee, or the state legislature. If the policymaker establishes policy and procedure on an informal basis without the aid of formal policy and procedure guidelines—that is, decides policy on a case-by-case basis—then his pronouncement in a given case reflects the state's position. Thus, a party who suffers a loss without due process protection in his individual case may easily argue that the loss occurred as a result of an inadequate established procedure.

In another scenario, consider a policymaker or series of policymakers who establish policy and procedure through a deliberative, or even legislative, process which culminates in a certain concrete position expressed in a formal pronouncement. In such a situation, it is reasonable to believe that only the results of that more formal process reflect the state's established policy and procedure. If the policymaker's subordinate, or even the policymaker himself, deviates in a single instance from the more formal pronouncement, it is less likely to reflect a new trend in state policy and procedure. A shift in policy is only likely to occur in one of two situations. First, a shift occurs if the same formal steps which created the original policies and procedures are repeated and culminate in the pronouncement of new policy and procedures. Second, a state's position may change if the policymaker repeatedly deviates from the formally established policy and procedure until his practice and custom has replaced the formal policy and procedures.

We believe that this case more closely reflects the latter of these two possible scenarios. The State of Illinois established the DCFS's licensing procedures through the traditional legislative process, culminating in a body of concrete statutory law which established step-by-step policy and procedure for granting and renewing the licenses of child welfare agencies. In addition, the statutory law provided the framework for the DCFS's day-to-day policy and procedure manual. In effect, the "policymaker" was the state legislature. It is true that the state delegated some of the rulemaking power to the DCFS, but that entity likewise set its formal policies and procedures through a deliberative process which culminated in a set of formal rules and regulations. Thus, the combination of the state legislature's and the DCFS's formal pronouncements comprise the state's established procedure.

Because the state promulgated policy and procedure by formal means, the employment status of the state employee violating that procedure must be considered much less important in determining whether a deviation from the policy may be characterized as random and unauthorized under *Parratt*. Even if we assume that the appellants qualify as "policymakers" themselves—which we doubt given their position in the governmental hierarchy—their "policy", which at absolute best may be characterized as informal, cannot be said automatically to preempt or displace otherwise adequate existing state policy and procedure. Because the state through its designated policymaking branches created its formal policies and procedures, we cannot entertain a claim that the single act of a state employee now reflects the state's established policies and procedures.

If, as Easter House contends, this case more closely resembles *Logan* than *Parratt* and *Hudson*, then we of course would be forced to find that the state's established procedure was itself inadequate to guarantee the requisite due process protection. In *Logan*, the state had passed a statute which required a claimant under the state's employment laws to file a claim with the state employment commission prior to filing a lawsuit. The law also required the commission to hold a hearing upon the claim within 120 days. However, the law further provided that the claimant's claim would be barred if for any reason the hearing was not held within 120 days, although the commission was required to grant the hearing automatically. The commission's failure to hold the plaintiff's hearing within 120 days resulted in a jurisdictional bar to his employment claim

prompting him to file a § 1983 due process action.

The Supreme Court stated that the plaintiff's complaint should not be characterized as challenging the high-ranking state employees' failure to grant the requisite hearing in a timely manner when they had a duty to do so. Rather, the Court noted that the procedure itself was inadequate, not because the commission failed to grant the hearing, but because the statute contained a series of provisions which would allow a deprivation to occur "by operation of law" under a wide variety of possible scenarios. 455 U.S. at 436, 102 S.Ct. at 1158. That is, because the law mandated that the claimant file a claim with the commission before he could proceed in court, and because it further deprived the claimant of his claim without a hearing if *for any reason* a hearing on the claim was not held in 120 days, the law itself was deemed to be inadequate in protecting the claimant's property interest. Thus, contrary to Easter House's assertions, the high-ranking *Logan* defendants' failure to perform their duties did not constitute an "established state procedure"; the state statute itself was the inadequate component in the deprivation process.

In contrast, here the State of Illinois adopted a procedure which provided adequate due process protection; it contained no loopholes which would allow a deprivation to occur without due process unless the state employees acted in an unforeseen way. For example, the state's procedure detailed the method in which renewal licenses and charter applications should be handled. The law at that time even provided that, in the case of the former, a child welfare agency could continue to operate without a current license in hand while awaiting a final decision by the state and the courts upon its application for a renewal license. *See supra* note 12 (discussing 1969 Ill.Laws 106 (current version as amended at Ill.Rev.Stat. ch. 23, ¶ 2219(b) (1988))). Thus, the state procedure was adequate in-and-of-itself unlike the procedural scheme promulgated by the state in *Logan*.

Only when the appellants took action which went beyond the realm of the foreseeable did Easter House suffer a property deprivation. If the appellants had merely refused to follow established procedure, Easter House would have been able to continue operations pending a final determination by the courts. However, because the appellants took further steps—contacting the adoption court and responding incorrectly to inquiries by prospective parents and job applicants—Easter House arguably experienced a property deprivation. As a result, we believe that *Logan* is distinguishable and that *Parratt* provides the proper analysis.

■ For all of these reasons, we conclude that Easter House cannot maintain a § 1983 action in light of the Supreme Court's pronouncements in *Parratt* and *Hudson*. The Supreme Court has attempted to strike a balance between the competing interests of providing a remedy for injuries sustained in connection with violations of constitutional rights and avoiding the use of § 1983 as just another opportunity for parties to shop between state and federal forums. The Court's decision in *Zinermon* does not appear to alter this balance. Accordingly, we continue to believe that *Parratt* must be read broadly enough to avoid turning the fourteenth amendment into a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Parratt*, 451 U.S. at 544, 101 S.Ct. at 1917; *see also Daniels v. Williams*, 474 U.S. 327, 333–34, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986).

Section 1983 must be preserved to remedy only those deprivations which actually occur without adequate due process of law, such as those which result from a *state's* conscious decision to ignore the protections guaranteed by the Constitution. It should not be employed to remedy deprivations which occur at the hands of a state employee who is acting in direct contravention of the state's established policies and procedures which have been designed to guarantee the very protections which the *employee* now has chosen to ignore. Such a limi-

tation upon § 1983 maintains the delicate balance between the state and federal judicial systems, leaving the former to remedy individual torts and the latter to address property deprivations which occur without adequate due process protection.

### iv. *Adequate State Law Remedies*

Having decided that the appellants' conduct may be characterized as "random and unauthorized" under *Parratt* and "unpredictable" under *Zinermon,* we must decide whether meaningful postdeprivation remedies exist under state law. The parties have not discussed this issue at much length, leading us to believe that they have little disagreement that Illinois law provides Easter House with remedies to redress its injuries. Nevertheless, we will address some of the general concerns which Easter House's briefs suggest may preclude application of *Parratt.*

Easter House apparently believes that the remedies available under Illinois law are not as substantial as those available under § 1983. It also characterizes the state road to recovery as a "lengthy and speculative process", especially in light of the appellants' potential qualified immunity claims. As a result, it contends that the state has not provided it with a "meaningful postdeprivation procedure" as contemplated by *Parratt.*

Initially, we note that Easter House may seek a wide variety of relief in state court under numerous legal theories. For example, Illinois common law provides a former employer with a remedy against a former employee who solicits key clients and improperly exploits benefits gained by his or her prior employment. *See, e.g., Corroon & Black of Ill., Inc. v. Magner,* 145 Ill. App.3d 151, 494 N.E.2d 785, 98 Ill.Dec. 663 (1986); *Smith–Shrader Co. v. Smith,* 136 Ill.App.3d 571, 483 N.E.2d 283, 289–90, 91 Ill.Dec. 1, 5–6 (1985). In a similar vein, Illinois law recognizes a tort action which businesses may bring against parties which interfere with business relationships or their right to conduct business generally. *See, e.g., American Pet Motels, Inc. v. Chicago Veterinary Medicine Ass'n,* 106 Ill.App.3d 626, 435 N.E.2d 1297, 62 Ill.Dec. 325 (1982); *Streif v. Bovinette,* 88 Ill. App.3d 1079, 411 N.E.2d 341, 44 Ill.Dec. 372 (1980). In addition, under Illinois law, an injured party may bring an action if a third party interferes with the injured party's contractual relations or if it "tortiously interferes" with the injured party's "prospective economic advantage." *See, e.g., Singh v. Curry,* 667 F.Supp. 603 (N.D.Ill. 1987); *Williams v. Weaver,* 145 Ill.App.3d 562, 495 N.E.2d 1147, 99 Ill.Dec. 412, 417 (1986); *Galinski v. Kessler,* 134 Ill.App.3d 602, 480 N.E.2d 1176, 89 Ill.Dec. 433, 437 (1985).

Illinois courts also have stated that the right to do business constitutes "property," and access to one's place of business or the enjoyment of the good will attending it are incidents of "property," as respects liability for interference therewith. *See, e.g., Meadowmoor Dairies v. Milk Wagon Drivers' Union of Chicago,* 371 Ill. 377, 21 N.E.2d 308 (1939). Thus, a business may bring an action for the tort of malicious and wrongful impairment of property if it is based upon a civil wrong. *See, e.g., Nemanich v. Long Grove Country Club Estates, Inc.,* 119 Ill.App.2d 169, 255 N.E.2d 466 (1970). Finally, to protect its interest in exclusive use of its name, Easter House might bring a deceptive trade practice action under paragraph 313 of chapter 121½ of the Illinois Revised Statutes. Under this statutory provision, Easter House may seek injunctive relief as well as any other "remedies otherwise available against the same conduct under the common law and other statutes of the state."

We believe that these potential causes of action, among others, adequately afford Easter House "meaningful post-deprivation remedies" sufficient to provide the requisite due process protection.[14] As for East-

---

**14.** We believe that Easter House may have more state law remedies other than those causes of action listed herein. However, we need not discuss every possible theory of recovery to find that the available remedies are adequate to provide meaningful postdeprivation relief. We likewise do not intend to suggest that we believe that Easter House is absolutely entitled to recov-

er House's qualified immunity concerns, we do not think that the otherwise adequate state law remedies will be curtailed by the appellants' ability to avail themselves of the immunity which public officials ordinarily enjoy. Paragraph 801 of chapter 127 of the Illinois Revised Statutes prohibits suits against the State of Illinois, unless they are brought in the Illinois Court of Claims, Ill.Rev.Stat. ch. 37, ¶ 439.8. However, the Illinois Supreme Court has held that state employees are not granted immunity similar to that enjoyed by the state. *See, e.g., Senn Park Nursing Center v. Miller,* 104 Ill.2d 169, 470 N.E.2d 1029, 1038–39, 83 Ill.Dec. 609, 618–19 (1984); *see also Smith v. Jones,* 113 Ill.2d 126, 497 N.E.2d 738, 740, 100 Ill.Dec. 560, 562 (1986) ("An action against a state official for conduct in his official capacity will withstand a motion to dismiss the complaint on sovereign immunity grounds if the complaint alleges that the official is ... violating the law of Illinois and thus acting beyond his authority"); *Children's Memorial Hosp. v. Mueller,* 141 Ill.App.3d 951, 491 N.E.2d 103, 96 Ill.Dec. 289 (1986) ("immunity extends not only to actions where the State is named as the defendant, but also to actions against State departments, such as DCFS, and State officers acting pursuant to their *lawful* authority" (emphasis added)); *see also National Communication Sys., Inc. v. Michigan Public Serv. Comm'n,* 789 F.2d 370, 373 (6th Cir.1986) (discussing the adequacy of state law remedies in light of potential immunity claims and the principles established by *Hudson* ).

Finally, we also must reject Easter House's characterization of the state recovery process as a "lengthy and speculative process" which forecloses the application of *Parratt.* In *Hudson,* the Supreme Court rejected an argument that state law relief should be deemed inadequate because it "is far from certain and complete." 468 U.S. at 535, 104 S.Ct. at 3205. The Court also stated that the fact that an injured party "might not be able to recover under [the state law] remedies the full amount which he might receive in a § 1983

ery under any of these theories and leave the

action is not ... determinative of the adequacy of the state remedies." 468 U.S. at 535, 104 S.Ct. at 3204–05 (citing *Parratt,* 451 U.S. at 544, 101 S.Ct. at 1917); *see also National Communication Sys., Inc.,* 789 F.2d at 373.

We note that almost all litigation, whether conducted in a state or federal forum, may be characterized as a lengthy and speculative process. Litigants often decry the speed with which courts administer justice and likewise may lament that a particular forum may yield a more favorable result depending upon the nature of the claim and the particular position they support. However, we should not reject the application of *Parratt* unless the remedy which an injured party may pursue in state court can readily be characterized as inadequate to the point that it is meaningless or nonexistent and, thus, in no way can be said to provide the due process relief guaranteed by the fourteenth amendment. Consequently, we hold that Easter House's arguments are misplaced.

Based upon our reading of *Hudson* and *Parratt,* we hold that adequate state remedies exist to correct any injuries which may have resulted from the appellants' improper conduct. We do not intend our decision to be read as foreclosing § 1983 actions any time a state provides an alternative forum for relief. However, when alternative relief exists and the facts of a case dictate that *Zinermon* does not render *Parratt* and *Hudson* inapplicable, a plaintiff's due process rights are not violated and no basis for a section 1983 action exists. *See Kauth v. Hartford Ins. Co. of Illinois,* 852 F.2d 951, 955–56 and n. 8 (7th Cir.1988) ("if a state provides an adequate means of addressing a property deprivation, the victim of the deprivation has been accorded due process of law"). Any action for injuries thus must be brought in the state forum. In summary, we hold that the *Parratt* line of cases, culminating in *Zinermon,* preclude an action by Easter House pursuant to § 1983 for the injuries which resulted from the alleged licensing

matter to the Illinois courts where it belongs.

conspiracy because it received all of the process which was due.

## B. *The Conspiracy to Harass* [15]

We now must analyze the second count of Easter House's complaint which seeks damages for the DCFS's repeated investigations in 1977, to determine whether it states a claim for relief under § 1983. Once again, the parties do not dispute that the appellants were acting under color of state law when they investigated Easter House. However, the appellants argue that Easter House cannot identify any "constitutionally protected interest" which was infringed by the investigations or, in the alternative, cannot demonstrate that the investigations constituted a deprivation of constitutional magnitude.

Easter House argues that it has a due process right "to be free from unfounded harassment." However, we agree with the appellants that Easter House has not identified any support for its argument that such a right exists or demonstrated whether this purported "right" implicates a property or liberty interest.

In substance, Count II of Easter House's complaint seems to be a claim for malicious prosecution. Ordinarily, a claim of malicious prosecution does not state a basis for relief under § 1983. *See, e.g., Antonelli v. Burnham,* 582 F.Supp. 1067, 1071 (N.D.Ill.1984) ("[M]alicious prosecution, standing alone, is insufficient to state a claim for relief under Section 1983"); *see also Grove School v. Guardianship & Advocacy Comm'n,* 642 F.Supp. 1043, 1048 (N.D.Ill.1986) (investigation by state regulatory authority does not violation Constitution merely because it may discredit views of school administrator). Only if a plaintiff, in addition to being the target of a properly motivated investigation, can demonstrate that he has been "subjected ... to a deprivation of constitutional magnitude" may we find that he may maintain a § 1983 action. *Hampton v. Hanrahan,* 600 F.2d 600, 630 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *see also Cameo Convalescent Center, Inc. v. Senn,* 738 F.2d 836, 845 (7th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985).

Clearly, an unwarranted investigation by licensing officials conducted in a manner calculated to discourage customers or interfere with a licensee's business may violate a property right. *See, e.g., McGee v. Hester,* 724 F.2d 89, 92 (8th Cir. 1983); *see also McGee v. Hester,* 815 F.2d 1193 (8th Cir.) (affirming jury verdict for plaintiff), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987); *Reed v. Village of Shorewood,* 704 F.2d 943, 949 (7th Cir.1983) (opining that "harassment of customers, employees and relentless, baseless prosecutions" may constitute deprivation of property). However, Easter House's allegations of impropriety do not rise to the level of a property deprivation of constitutional magnitude. Easter House's only alleged injuries are the cost of answering the questions of the DCFS's investigator and making files available to them. Such "injuries" do not rise to the level of a constitutional deprivation of property. *See, e.g., Reichenberger v. Pritchard,* 660 F.2d 280, 285 (7th Cir.1981) ("legal fees expended by the plaintiffs in the administrative proceedings cannot qualify as a constitutional injury absent a showing of deprivation of constitutional magnitude"). We therefore hold that the district court erred in refusing to grant the appellants' motion for a directed verdict upon Count II of Easter House's complaint.[16]

---

**15.** With his consent, we have adopted in large part the analysis set forth by Judge Cudahy in the original panel opinion. *See* 852 F.2d at 909–10.

**16.** At trial, the district judge rejected the appellants' arguments that Easter House had not identified any constitutionally protected interest which was infringed by the investigation or

shown that it incurred any cognizable harm. He consequently sent the claim to the jury with an instruction that:

> Easter House has a constitutional right and liberty to operate its business without unfounded harassment by State officials....
> If you find that Easter House's due process rights were violated, but that it suffered no actual injury resulting from the violation,

## III. CONCLUSION

Today, we apply the principles established by a line of authority flowing from *Parratt v. Taylor* through *Zinermon v. Burch* to maintain a delicate balance between the state and federal legislative and judicial systems. Where adequate postdeprivation remedies exist in a state to redress a property deprivation which has resulted from an employee's random and unauthorized deviation from established state policy and procedure, a party cannot maintain a § 1983 action because he has received all of the process which was due. Having reexamined our prior decision in light of *Zinermon,* we again hold that *Parratt* controls Easter House's § 1983 claims against the appellants for their part in the alleged licensing and investigation conspiracies.

With respect to the licensing conspiracy, Easter House had a property interest in its 1974 renewal license, and we have assumed that the appellants deprived it of that right by participating in the alleged licensing conspiracy. Nevertheless, we specifically reject Easter House's arguments that (1) *Parratt* is limited to minor deprivations of property, (2) a conspiracy can never be characterized as involving random and unauthorized conduct, (3) the failure of high-ranking state and local officials to provide the due process protections which the state has placed in their hands amounts to established state procedure which is *per se* authorized improper state activity, and (4) Illinois has failed to provide meaningful postdeprivation remedies.

With respect to the alleged conspiracy to harass, we conclude that Easter House has failed to support its assertion that it has a right "to be free from unfounded harassment." Easter House plainly has failed to demonstrate that it suffered a deprivation of constitutional magnitude sufficient to turn its malicious prosecution claim into one cognizable under § 1983. Consequent-

ly, the district court should not have submitted the claim to a jury.

The district court's decision therefore is REVERSED and we REMAND the case and ORDER the district court to enter judgment in favor of the appellants.

EASTERBROOK, Circuit Judge, concurring.

*Zinermon v. Burch,* —— U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), is inconsistent with the foundations of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). *Zinermon* said that if errors in the implementation of a state's scheme for civil commitment are foreseeable, then process after the fact is inadequate, and it "distinguished" *Parratt* and *Hudson* on the ground that the wrongs committed in those cases were not foreseeable. This is no distinction at all. It is always foreseeable that there will be some errors in the implementation of any administrative system, and it is never foreseeable which occasions will give rise to these errors. It was foreseeable that some prison guards would lose the prisoners' property (*Parratt*), just as it was foreseeable that some persons would be committed without proper authorization (*Zinermon*); in neither case could the state or a court know in advance just when the errors would occur. If foreseeability of the *category* of blunders requires process in advance, then *Parratt* and *Hudson* were wrongly decided; if the inability to foresee the *particular* blunder makes subsequent remedies all the process "due", then *Zinermon* was wrongly decided. The cases cannot coexist, except perhaps by drawing a distinction between liberty and property, or between important and modest deprivations, neither of which the majority in *Zinermon* adopted. If *Zinermon* had overruled *Parratt* and *Hudson,* a step its analysis logically entailed, then I would agree with Judge Cudahy that the majority's analysis is unsound. But the Court did

then you should award Easter House nominal damages in the amount of one dollar.

Because we believe that the district court should have granted a directed verdict on the second

count of Easter House's complaint, we consequently hold that it erred in giving this instruction.

not take this step. Instead it said, 110 S.Ct. at 985, that *Zinermon* could live side by side with *Parratt* and *Hudson.*

Inconsistent lines of precedent are common in American law. *Zinermon* illustrates one reason why. Four Justices (Rehnquist, O'Connor, Scalia, and Kennedy) believe that, when the law on the books complies with constitutional rules, redress in state court after a state's employees botch up usually supplies due process of law. My opinion concurring in this court's first in banc decision, 879 F.2d 1458, 1478–81 (7th Cir.1989), was to the same effect. See also *Thornton v. Barnes,* 890 F.2d 1380, 1389–90 (7th Cir.1989). Three Justices (Brennan, Marshall, and Blackmun) believe that prior hearings are almost always necessary, and they object to treating deprivations followed by judicial process as constitutionally adequate. Two Justices (White and Stevens) are more ambivalent, and their differing emphases lead the Court as an institution to take a meandering line that none of the remaining seven finds satisfactory. *Hudson,* like *Zinermon,* was decided 5–4 (with Justice White in the majority and Justice Stevens in dissent); *Parratt* produced a multitude of opinions; other cases citing *Parratt* have placed different slants on its holding, depending on which Justice describes it; Justice Stevens has not fully subscribed to any of the competing views his colleagues hold, but has attempted to maintain the line of demarcation he drew in *Bonner v. Coughlin,* 517 F.2d 1311, 1318–20 (7th Cir.1975), modified in banc, 545 F.2d 565 (7th Cir. 1976), a line that depends on the differences between liberty and property (and between compelling and trifling deprivations). *Zinermon* could not overrule *Parratt* because a majority of the Justices still support it—but their support does not embrace the principles that its author (Justice Rehnquist) believes it stands for.

Such hair-splitting leaves judges of the inferior federal courts in a difficult position, because any effort to reconcile and apply the cases will be met with a convincing demonstration (which Judge Cudahy has supplied) that there is a fly in the ointment. So it is not surprising both that the Fifth Circuit has announced that *Zinermon* compels us to decide this case for the plaintiff, see *Caine v. Hardy,* 905 F.2d 858, 862 (5th Cir.1990), rehearing granted, 905 F.2d at 867, and that Judge Jones could pierce the majority's reasoning with at least as much force as Judge Cudahy has mustered against our majority. Differences that would not necessarily persuade all of the Justices in the majority of *Zinermon* may well persuade one or two, and so a line of precedent already resembling the path of a drunken sailor may take a new turn. I believe that despite the force of Judge Cudahy's arguments, Judge Kanne offers the best estimate of the course a majority of the Court will take, and I therefore join his opinion. See also *Caine,* 905 F.2d at 863–867 (Jones, J., dissenting).

Perhaps, however, it is unnecessary to rely on *Parratt* at all. That case, like the others that follow in its wake, starts from the assumption that the Constitution requires pre-deprivation process. If prior hearings are the constitutional norm, it is easy to see why the Court should be stingy with the exceptions. Prior oral hearings are not always necessary, however. Whether the Constitution requires process in advance of a particular kind of deprivation depends in part on the adequacy of post-deprivation process. So in both *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 195–96, 105 S.Ct. 3108, 3121–22, 87 L.Ed.2d 126 (1985), and *Ingraham v. Wright,* 430 U.S. 651, 674–82, 97 S.Ct. 1401, 1414–18, 51 L.Ed.2d 711 (1977), the Court held that a state may act quickly (regulating property in a way that could amount to a "taking" in *Williamson,* paddling a pupil in *Ingraham*) and satisfy its constitutional obligation by opening its courts to those injured by errors. See also, e.g., *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 619, 94 S.Ct. 1895, 1906, 40 L.Ed.2d 406 (1974); *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Action now, litigation later, was the *norm* in both *Williamson* and *Ingraham,* which the Court held satisfied the state's obligation to extend due process of law.

Actions against regulated businesses commonly precede full hearings, and cases such as *FDIC v. Mallen*, 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), hold that there is no unyielding rule that hearings come first. Since *Zinermon* we have twice sustained Illinois' summary procedure for qualifying the licenses of nursing homes. *Somerset House, Inc. v. Turnock*, 900 F.2d 1012 (7th Cir.1990); *Altenheim German Home v. Turnock*, 902 F.2d 582 (7th Cir.1990). Strong interest in protecting children, who cannot protect themselves, is more than enough to justify abrupt handling of adoption agencies, reserving to later hearings the question whether the state acted precipitously.

Regulatory delay is endemic: licenses to operate TV stations sometimes expire years before the FCC gets around to holding hearings on renewal. Licensees keep broadcasting in the meantime, just as Easter House was entitled to keep placing children for adoption once it hired a qualified social worker. Illinois' delay was modest by administrative standards. The old license expired December 1, 1974; the new one came through on February 19, 1975. Although in the interim a state employee told a state judge that Easter House's authority had lapsed, it is undisputed that this was mistaken as a matter of state law. The proposition that a mistaken statement of state law by a single state official violates the due process clause of the fourteenth amendment would make hash out of the norm that a government need not pay just because its employees utter mistaken statements of law. See *OPM v. Richmond*, —— U.S. ——, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990).

*Zinermon* dealt with liberty, and the Court required states to protect the important interests of those who could not protect themselves. Easter House seeks to vindicate the kind of interests that can be measured in money and redressed long after the event; the state's interest was in protecting the young at the potential expense of the adoption agency. If the state erred, its courts supply all of the process that is due.

CUDAHY, Circuit Judge, with whom CUMMINGS and POSNER, Circuit Judges, join, dissenting:

The Supreme Court has remanded this case to us for reconsideration of Easter House's procedural due process claim in light of *Zinermon v. Burch*, —— U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The majority unfortunately misses the point of *Zinermon*, which must surely compel a result opposite to the majority's conclusion here. *Zinermon*, it seems to me, fully supports the analysis contained in my opinion for the original panel in this case, 852 F.2d 901 (7th Cir.1988), and my dissent to the *en banc* majority's prior opinion, 879 F.2d 1458, 1481–84 (7th Cir.1989). Based on *Zinermon*, I have little choice but to renew my dissent.

Before *Zinermon*, there was a vigorous debate about the reach of the rule announced in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In *Parratt* and *Hudson*, the Court held that the deprivation of a property interest caused by the "random and unauthorized" act of a state employee does not violate the Constitution's procedural due process guarantee where the state has provided adequate postdeprivation remedies. As the Supreme Court observed in *Zinermon*, some circuits had applied the *Parratt/Hudson* rule "even to deprivations effected by the very state officials charged with providing predeprivation process." 110 S.Ct. at 978 n. 2 (collecting cases). It has, of course, been clear since the Court's decision in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), that *Parratt* does not extend to cases in which an "established state procedure" destroys someone's property right without according that person proper predeprivation process. In a case involving a county official's abuse of his office, a panel of this court recognized that *Parratt* could be construed both broadly and narrowly and opted for a narrow construction of the rule under the facts presented. *Tavarez v. O'Malley*, 826 F.2d 671 (7th Cir.1987) (Posner, J.). But

before *Zinermon,* the vast territory between the *Parratt* situation on the one hand and the *Logan* scenario on the other remained largely uncharted. The Court granted certiorari in *Zinermon* precisely in order to resolve the circuit conflict over *Parratt's* proper scope.

The Supreme Court's decision in *Zinermon* is certainly consistent with a narrower interpretation of *Parratt,* like that employed in *Tavarez. Zinermon* holds that a predeprivation hearing is required, where possible, when the occurrence of a constitutional deprivation is not unforeseeable. This is a far fetch from the view that only *Logan* defines the paradigmatic circumstances in which predeprivation process is required. *See Greco v. Guss,* 775 F.2d 161, 171 (7th Cir.1985) (Wood, Jr., J.) ("The controlling inquiry [under *Parratt* and *Logan* ] is *not* whether the deprivation resulted from an established state procedure but rather whether predeprivation process was practical."). *Zinermon* explains, indeed, that predeprivation process is the rule, not the exception. Yet the majority has glossed over *Zinermon's* import in an effort to preserve the broad application of *Parratt* it employed in its first *en banc* opinion.

Before *Zinermon,* the majority's due process analysis was plausible. But in view of *Zinermon,* it is no longer conceivable that the *Parratt* rule may be applied so broadly as the majority applies it here. The majority opinion goes to great lengths to distinguish *Zinermon* factually from the present case. In doing so, the majority demonstrates its continued adherence to the view, rendered wholly untenable by *Zinermon,* that *Parratt* may be applied in any case except one involving an "established state procedure," as in *Logan.* Indeed, the majority treads dangerously close to categorizing *Zinermon* as a *Logan*-type case. *See* Majority op. at 1401 (opining that Florida legislature's broad delegation of uncircumscribed authority to hospital staff was "statutory oversight" which rendered liberty deprivation predictable). The majority evidently considers *Zinermon* merely another narrowly factual exception to the broad application of *Parratt. See*

*id.* at 1401 ("[W]hen alternative relief exists and the facts of the case dictate that *Zinermon* does not render *Parratt* and *Hudson* inapplicable, a plaintiff's due process rights are not violated and no basis for a section 1983 action exists."). The majority's niggardly interpretation of *Zinermon* could not be more wrong.

The majority's failure to confront *Zinermon* head-on has forced it into a series of contradictions. These contradictions in turn have led the majority to enlist a battalion of straw men in order to help evade the real issues here. The majority's predicament is most evident in its continued difficulty defining who or what is the "state" and what conduct by which state employees may give rise to a section 1983 action against the state. In the majority's view, only "policymakers" may be equated with the "state" because only a "policy" that results from "formal policymaking process" amounts to an "established state procedure." *See* Majority op. at 1402–1403. The majority's error in this regard obviously derives from its intransigent adherence to the view that *Logan* describes the only exception to the applicability of the *Parratt* rule.

In casting the problem of what constitutes "state" action as a question whether or not a particular state employee's status in the official hierarchy will make that employee's conduct *per se* attributable to the state, the majority is simply tilting at windmills. Whether a person is the "state" will inevitably depend upon the scope of that person's official authority and the facts of the particular case. It should be clear in light of *Zinermon,* however, that, for purposes of determining whether the "state" has violated an individual's constitutional right to due process, the "state" generally includes any person to whom is delegated the responsibility of giving predeprivation process. *See* 110 S.Ct. at 990 ("The State delegated to [the hospital staff] the power and authority to effect the very deprivation complained of here ... and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement.").

This definition unquestionably includes Felder, the Illinois official who was charged with providing notice and a hearing before declining to renew Easter House's license.

It makes no difference that Felder's authority was "circumscribed" by state laws and agency regulations. The decision to grant process was within his scope of authority, and he should not be absolved of liability for abusing his discretion simply because the state laws and regulations, had he followed them, would have satisfied the Constitution's due process requirement. In *Zinermon,* the Court relied heavily on its holding in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (overruled in part not relevant by *Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), that section 1983 applies to *all* violations of constitutional rights—not only those that are authorized by state law, but also those that result from abuses of state authority and are forbidden by state law. 110 S.Ct. at 982; *see also Tavarez,* 826 F.2d at 677 (State officials could not "escape liability under section 1983 simply by exceeding the scope of their authority."). I am confounded, therefore, by the majority's persistence in characterizing Felder's abuse of his official power as "random and unauthorized" conduct for which the state may not be held liable under the *Parratt* rule.*

While it is jousting with imaginary adversaries, the majority ignores the gist of *Zinermon.* The constitutional principles discussed in *Zinermon* apply to all situations in which state officials charged with implementing a statute fail to provide constitutionally required predeprivation process when to do so would not be impossible or impracticable. The key is whether it is *reasonably possible* to hold a hearing. The balancing test announced in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), is not, as the majority supposes, concerned with whether the property deprivation occurred pursuant to a "formal" or "informal" state policy, but rather whether predeprivation process was *feasible.* Indeed, the Supreme Court has explicitly rejected the proposition that *Parratt* may apply when predeprivation process is feasible, as long as the state provides adequate *post* deprivation process. *Zinermon,* 110 S.Ct. at 987 ("In situations where the State feasibly can provide a predeprivation hearing before taking the property, it generally must do so, regardless of the adequacy of a post-deprivation tort remedy to compensate for the taking."); *see also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The Court emphasized in *Zinermon* that "*Parratt* and *Hudson* represent a special case of the *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon,* 110 S.Ct. at 985 (emphasis added).

Thus, *Zinermon* simply reaffirms the functional test supplied by *Mathews v. Eldridge.* If the deprivation was *predictable* and predeprivation process was *possible,* the state should be held liable for failure to provide predeprivation process. It is eminently predictable (and not, unfortunately, unusual) that an official such as Felder who acts for the state in determining whether or not a license will be renewed

---

* It seems to me that the majority stumbles over the definition of another key word: "authorized." As the Supreme Court explains in *Zinermon,* the state employees' acts in *Parratt* and *Hudson* were "unauthorized" in the sense that those employees had no state-delegated *power* or authority to effect the deprivations that occurred in those cases, and they had no corresponding *duty* to provide the victims with procedural safeguards. In contrast, the authority delegated by the state to the hospital officials in *Zinermon*—like the authority vested by Illinois in Felder—was the power to act as a representa- tive of the state in depriving individuals of their liberty or property interests. This authority carried with it the duty to provide predeprivation due process. Thus, as in *Zinermon,* "[t]he deprivation here is 'unauthorized' only in the sense that it was not an act sanctioned by state law, but, instead, was a 'depriv[ation]' of constitutional rights ... by an official's abuse of his discretion.'" *Zinermon,* 110 S.Ct. at 990 (quoting *Monroe v. Pape,* 365 U.S. at 172, 81 S.Ct. at 476). The Court explicitly determined that such a deprivation is not "unauthorized" in the *Parratt* sense.

and whether or not notice and a hearing will precede the renewal decision may abuse his authority and simply deny the renewal without furnishing the licensee due process. Under *Mathews* and *Zinermon,* a designated process-giver who refuses to give process violates the Constitution as much as a legislature that establishes inadequate procedural protections for property or liberty deprivations.

I remain unpersuaded by the majority's cursory review of possible postdeprivation legal remedies available to Easter House. Under *Zinermon,* the mere existence of a postdeprivation tort claim (or a battery of potential tort claims) cannot excuse the state's failure to provide predeprivation process in most cases. *See also Tavarez,* 826 F.2d at 675 ("If due process is satisfied by the ordinary state judicial remedies for torts, then not only would virtually no interference with property be actionable under section 1983, but even such classic constitutional-tort cases as that of the policeman who kills a suspect in order to bypass the cumbersome procedures of the criminal justice system would not be actionable, provided the killing was a tort under state law."). Further, the majority persists in its superficial treatment of the thorny question of state immunity.

I had thought that the Supreme Court's decision in *Zinermon* would have resolved the dispute over the validity of Easter House's procedural due process claim. Instead, the majority has danced around *Zinermon,* disregarding the broad precedential impact of that case and merrily tripping down its own tortuous path toward what seems to me an obviously wrong conclusion. It is indeed regrettable that the majority has once again chosen a course that will unquestionably weaken the protections of section 1983 and leave citizens vulnerable to unconstitutional abuses of power by state officials. I respectfully dissent.