**UNIVERSAL SECURITY INSURANCE CO., a Tennessee corporation; Prestige Casualty Company, an Illinois corporation; and Sam C. Hakemian, Plaintiffs,**

**v.**

**Norman KOEFOED, in his individual capacity, Defendant.**

**No. 90 C 5265.**

United States District Court,
N.D. Illinois, E.D.

Aug. 28, 1991.

Edward F. Ruberry, Chicago, Ill., for plaintiffs.

John A. Simon, Asst. Atty. Gen., General Law Div., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

On August 10, 1990, plaintiffs Sam Hakemian, Universal Security Insurance Company ("Universal"), and Prestige Casualty Company ("Prestige") filed this action in the Circuit Court of Cook County, seeking relief under 42 U.S.C. § 1983. On September 10, 1990, the defendant, Norman Koefoed, removed it to this court. Although plaintiffs' allegations are complex and at times disjointed, the essential claim is that defendant, Norman Koefoed, abused his authority as an agent of the State of Illinois in order to carry out a personal vendetta to injure plaintiffs' personal and business reputations and to interfere with business activities in violation of substan-

tive due process and equal protection safeguards secured by the Fourteenth Amendment of the United States Constitution. This matter is before the court on Koefoed's motion to dismiss plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the following reasons, the motion to dismiss is granted.

## I. FACTUAL ALLEGATIONS [1]

Hakemian resides in Florida and is the sole owner of Universal, a Tennessee Corporation which has its principal place of business in Boca Raton, Florida. Hakemian is also the sole owner of Prestige, an Illinois corporation with its principal place of business in Skokie, Illinois. Koefoed is an Assistant Deputy of the Illinois Department of Insurance.

Hakemian complains of Koefoed's interference with two aspects of his business operations. The first involves Koefoed's actions in relation to a Tennessee Department of Commerce and Insurance investigation of Universal. The second involves Koefoed's actions regarding Hakemian's efforts to purchase Prestige.

### A. Tennessee Investigation

On March 20, 1989, the Tennessee Department of Commerce and Insurance began an investigation of Universal's financial practices for reasons unspecified in the complaint. Examiners from several states where Universal did business were also involved in the investigation. Pursuant to Tennessee statute, Universal was required to provide these examiners with information about the company and to bear the costs of the investigation. On several occasions, Harold E. Payne, the examiner in charge of the Tennessee investigation, came to Chicago to meet and exchange information with Koefoed. According to the complaint, the meeting was part of

---

**1.** For purposes of this motion to dismiss, we shall accept all well-pleaded allegations as true and draw all reasonable inferences from them in favor of the plaintiffs. *New Burnham Prairie Homes v. Village of Burnham,* 910 F.2d 1474 (7th Cir.1990).

Koefoed's plan to unreasonably interfere with Hakemian.[2]

On July 21, 1989, the Tennessee Department issued an "Order of Supervision" which rendered Universal incapable of conducting any business.[3] Allegedly, Koefoed illegally obtained a copy of this order and later used it against Hakemian at the Illinois hearings regarding the acquisition of Prestige. The reasons for the order are unspecified, as is the role Koefoed played in its issuance. Although Universal claims that it was rendered incapable of conducting business, the complaint is devoid of any specific allegations of business harm. There are no allegations that Universal lost revenues or customers. Indeed, three days after the order was entered, enforcement of the order was restrained by means of a Temporary Restraining Order.

### B. Illinois Hearings

The same day the Order of Supervision was entered, Koefoed requested that his department send investigators to Tennessee to join in the audit. Three days later, the Illinois Department of Insurance held its first hearing on Hakemian's proposed acquisition of Prestige. At this time, Hakemian said that he would infuse $5,000,000 into Prestige so that the department would not consider Prestige impaired. The next day, July 25, 1989, a Special Investigatory Warrant was issued to permit Illinois Department investigators to go to Tennessee. Hakemian alleges that the agents went to Tennessee to investigate Universal as part of Koefoed's plan to "bring down" Hakemian. Additionally, plaintiffs assert that Koefoed's intent in sending the investigators to Tennessee was to obtain a copy of the Order of Supervision to later use against Hakemian at the

hearings regarding the purchase of Prestige.

On August 15, 1989, the Department held a second hearing on the proposed acquisition. As a result of the two hearings, on November 15, 1989, the Department subsequently approved the acquisition, contingent upon Hakemian's infusion of $5,000,000.[4]

Hakemian alleges that, once he secured the right to purchase Prestige, Koefoed attempted to interfere with Hakemian's ability to obtain financing. Koefoed contacted counsel for local Chicago banks and tried to persuade some of them not to make loans to Hakemian and another not to renew a previously negotiated loan. Koefoed told counsel for the banks that the Department was going to take action against Hakemian, and Koefoed disseminated false information designed to ruin Hakemian's reputation. As a result, the banks' counsel requested additional information which delayed renewal of loan arrangements and caused other banks not to participate in the loan package. In addition, Koefoed caused the State of Illinois to make unauthorized inquiries into Hakemian's personal line of credit with the Florida National Bank. Koefoed also gave false information to the bank which resulted in the revocation of Hakemian's personal credit line.

As a result of these actions, Hakemian claims that he suffered damage to his banking relationships. Additionally, he was subjected to sanctions and a suit by the Department for failure to timely deposit the money he had promised, but the complaint contains no mention of the nature or outcome of the suit nor of the specific sanctions.

In spite of all of these alleged interferences, Hakemian successfully obtained financing and acquired Prestige. During the

2. Plaintiff alleges that Payne's trips to Chicago were to "perpetuate and further develop Koefoed's plan to 'bring Sam Hakemian down,'" and "for the purpose of furthering the execution of a personal vendetta against ... Hakemian." (Complaint ¶ 10). Plaintiff also alleges that, as a result of these meetings, Payne "stepped up" his investigation, requesting voluminous documentation from Universal.

3. According to Hakemian, the order was illegally entered and not in conformity with Tennessee statutes.

4. In October, Hakemian, provided the Department with proof of a $3,000,000 deposit at a Chicago bank. The November order was contingent upon his raising the additional $2,000,000.

first week of January 1990, Koefoed visited Prestige and threatened to shut it down, and continues to cause Hakemian harm, though the type of harm is not specified. Although plaintiffs' response states that Koefoed continues to interfere with Prestige's daily business, neither the complaint nor the response contain any allegations of specific harm, such as lost revenue or customers.

## II. DISCUSSION

■ At the outset we observe that, although Universal and Prestige are named as plaintiffs, both have failed to allege any direct harm arising from Koefoed's actions. The gravamen of the complaint is that Koefoed had a personal vendetta against Hakemian. The only direct harm alleged by Universal is the cost of the investigation initiated by the Tennessee Insurance Department. Payment of those costs, however, is required by Tennessee statute. The complaint does not contain any allegations that Koefoed had any authority under Tennessee law to either conduct the investigation or to determine its scope. All acts leading up to any purported harm were done by officials from the State of Tennessee.

Prestige has also failed to allege specific harm to its business. During the period of most of the actions complained of, Hakemian did not even own Prestige. With respect to the time following the purchase, Prestige fails to allege any specific injury to its business, either reputational or financial. Accordingly, we dismiss any claims brought on behalf of Universal and Prestige. We will therefore analyze Koefoed's motion in terms of whether Hakemian individually has stated a claim under § 1983.

In order to sustain a claim for a violation of § 1983, a plaintiff must prove two things: (1) that the defendant was acting under the color of state law, and (2) that his conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981) (overruled in part, not relevant here, by *Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Regarding the first element, Hakemian sufficiently alleges that Koefoed was acting under color of state law by means of the authority given to him by the State of Illinois as an employee of the Illinois Department of Insurance. Thus, we turn to the question as to whether Hakemian's allegations of harm give rise to a claim of deprivation of substantive due process or equal protection rights.

### A. Substantive Due Process (Count I)

Although the exact limits to the due process clause are uncertain, it is clear not all wrongs which might render a state official liable under state tort law are wrongs in the constitutional sense. *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976). In *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1989), the Supreme Court identified three types of "due process" claims which may be asserted against a state official via the Fourteenth Amendment.[5] The first type is due process that is secured by the incorporation doctrine. The second is substantive due process which bars "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Id.* at ——, 110 S.Ct. at 983 (citation omit-

---

5. *But see* Burnham, *Separating Constitutional and Common–Law Torts: A Critique and a Proposed Constitutional Theory of Duty,* 73 Minn. L.Rev. 515, 517–19 (1989). Professor Burnham identifies four types of due process claims. In addition to "incorporated due process" and procedural due process, he divides the substantive due process clause into two components. Substantive due process consists of a "fundamental rights" component and a "shock the conscience" strand. Professor Burnham notes that, due to the incorporation doctrine, the shock the conscience strand of due process is rarely used in the criminal context. In the civil context, he defines this type of substantive due process as "outrageous behavior of officials not otherwise violative of any more specific constitutional provision." *Id.* at 518 n. 11. He also acknowledges that "shock the conscience" substantive due process has no clearly articulated limit. *Id.* at 519.

ted). The final type of due process is commonly called procedural due process.

■ Hakemian claims a deprivation only of his right to substantive due process. While procedural due process assures fair procedure in the decision-making process, the substantive due process clause is concerned with the decision itself. *Polenz v. Parrott*, 883 F.2d 551, 557 (7th Cir.1989). The substantive component of the due process clause has been referred to as an area of the law "famous for its controversy, and not known for its simplicity." *Schaper v. City of Huntsville*, 813 F.2d 709 (5th Cir.1987). Its precise parameters have been the subject of much confusion and the Supreme Court has yet to define its limits. *See, e.g., Reich v. Beharry*, 883 F.2d 239, 243 (3rd Cir.1989) (whether and when state created property interest invokes the substantive due process clause is subject to varying analyses). Nevertheless, our inquiry is guided and controlled by the precedent of this circuit. The Seventh Circuit has set out a two-prong test by which to measure an alleged violation of the substantive due process clause. In order to state a claim for a violation of substantive due process, a plaintiff must allege first that the government official's decision was arbitrary and irrational, and second, either that state remedies are inadequate or that an additional constitutional provision has been violated. *New Burnham Prairie Homes v. Village of Burnham*, 910 F.2d 1474, 1481 (7th Cir.1990); *Polenz*, 883 F.2d at 558; *Kauth v. Hartford Ins. Co. of Illinois*, 852 F.2d 951, 958 (7th Cir.1988).

■ Before applying this test, however, we first observe that Hakemian's claims would appear to suffer from certain threshold problems, which we will discuss briefly. The due process clause of the Fourteenth Amendment protects persons from deprivations of liberty and property. Thus, in order to state a claim based on the due process clause, a plaintiff must allege a constitutionally protected property or liberty interest. *Polenz*, 883 F.2d at 555. A property interest arises from some "legitimate claim of entitlement," which can be

found in "existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A liberty interest may be found under state law, but it may also be created directly from the Constitution. *Polenz*, 883 F.2d at 555.

■ The Seventh Circuit has indicated that it does not believe that substantive due process protects a state-created property interest, and has also questioned whether substantive due process may be invoked when the plaintiff does not challenge the constitutionality of a statutory scheme, as is the case here. *See Kauth*, 852 F.2d at 957–58. According to the Seventh Circuit, substantive due process has been used primarily in cases of deprivations of a liberty interest. *Id.* Therefore, whether a claim based on substantive due process is available to Hakemian may depend upon what type of interest he has asserted.

That question is difficult to answer in this case, since Hakemian's complaint fails to articulate precisely which type of interest he claims to have been deprived. Hakemian's complaint only details Koefoed's actions, which, according to Hakemian, "constitute an abuse of governmental power so gross and outrageous that it constitutes a violation of plaintiffs' substantive due process rights." In his response to the motion to dismiss, Hakemian attempts to define his interest as "the right to be free from unwarranted, secretive, and baseless attacks from one apparently speaking with the implicitly authoritative voice of the government," and as the "right to be free from slanderous, unwarranted and secretive attacks." Yet, even these allegations fail to explain precisely what Hakemian has lost in terms of liberty or property as a result of Koefoed's conduct.

In *Easter House v. Felder*, 910 F.2d 1387 (7th Cir.1990), the Seventh Circuit found that similar allegations failed to sufficiently define a protected liberty or property interest and therefore warranted dismissal of the claim. The plaintiff in *Easter House*, a private adoption agency, alleged that officials of the Illinois Department of

Children and Family Services ("DCFS") conducted repeated unwarranted investigations of its operating procedures and that such harassment violated § 1983.[6] *Id.* at 1390. The evidence of harassment included a statement by a DCFS official that on three occasions he told the department that the agency was operating legally but each time he was instructed to return and find evidence of wrongdoing. *Id.* at 1394. Similar to Hakemian, the plaintiff in *Easter House* defined its interest as a "due process right to be free from unfounded harassment." In reaching its decision to dismiss the plaintiff's claim, the Seventh Circuit noted the plaintiff's failure to provide any support for its interest and failure to identify whether the interest was based on liberty or property. The opinion, however, does not clearly indicate whether dismissal was warranted on this ground alone.[7]

Even if that consideration alone was not dispositive, the court in *Easter House* further determined that, regardless of how the plaintiff's interest was defined, the plaintiff's claim essentially was one for malicious prosecution, which ordinarily does not present a viable claim under § 1983. *Id.* at 1407. In order to bring such a claim under § 1983, a plaintiff must allege that, in addition to being the target of a improperly motivated investigation, he was subject to

a deprivation of constitutional magnitude.[8] *Id.* The court then proceeded to dismiss the plaintiff's claim because it did not suffer a deprivation of constitutional magnitude. The plaintiff's only injury was the cost of making files available to DCFS and having to put up with the repeated investigations. According to the court, such an injury was not enough.[9]

In this case, it is difficult to pinpoint what Hakemian was deprived of as a result of Koefoed's alleged conduct. Hakemian principally claims harm as a result of being subject to Koefoed's dissemination of allegedly defamatory information to banks from which Hakemian wished either to obtain or renew financing. The specific injuries that he claims are (1) that a bank revoked his personal line of credit, (2) that renewal of his loans was delayed, and (3) that he was required to provide banks with allegedly needless information. Ultimately, however, he obtained the money he sought. Thus, to the extent any of these events may be deemed to have resulted in a deprivation of property, the deprivation would appear to have been no more significant in magnitude than that administrative costs found constitutionally insufficient in *Easter House*. Hakemian further claims that he was subject to suit and sanctions for failure to comply with the November 15, 1989 purchase order, yet it is not evident

---

6. Although the court did not state whether plaintiff's general claim was one of procedural or substantive due process, we assume it was regarded as substantive in light of the court's treatment in the first part of the opinion of a separate claim which involved allegations that the DCFS conspired to revoke its license. The court plainly labelled that claim as one of procedural due process, and accordingly analyzed the claim under *Parrott v. Taylor* and its progeny. The harassment claim discussed in the text above, though also based on the due process clause, was not similarly analyzed, and thus it would appear that the court viewed it as something other than a procedural due process claim.

7. Indeed, in certain other respects, the analysis is also confusing. Nevertheless, in deciding the precedential effect to give the decision, we may rely on the result in *Easter House* and consider the extent to which the factual allegations in that case are conclusively similar to those presently under our consideration.

8. The published opinion refers to the investigation as one which was "properly" motivated. We must assume, however, that the court meant to say an "improper" investigation because a properly motivated investigation would not support a claim of malicious prosecution. In fact, the original panel opinion in *Easter House* referred to the investigation as one which was "improperly" motivated. *Easter House v. Felder*, 852 F.2d 901 (7th Cir.1988).

9. We are not entirely sure what the court intended by its passing observation that "an unwarranted investigation by licensing officials conducted in a manner calculated to discourage customers or interfere with a licensee's business may violate a property right." *Id.* We presume that the court meant that in certain circumstances harassment may result in a deprivation in the constitutional sense, but only where the conduct ultimately caused an actual loss of property or business.

that the suit ever transpired or that sanctions were ever paid. Finally, Hakemian claims that these actions were designed to ruin his personal and business reputation. On this point as well, however, neither his complaint nor his response clearly indicate that in the end he actually lost any business, customers or revenue. Within the framework of *Easter House,* we do not believe that the threat of being subject to a suit or having one's reputation challenged, without more, would amount to a deprivation of constitutional magnitude either.

Even assuming that Hakemian's claim overcomes the threshold concerns posed by *Easter House,* his claim must still be dismissed because it does not otherwise satisfy the Seventh Circuit's test for stating a substantive due process claim. While Hakemian clearly makes allegations from which we can infer that Koefoed's conduct was arbitrary and irrational, Hakemian has failed to allege either an additional constitutional violation or the inadequacy of state remedies as required by *Kauth* and the cases decided subsequent to it.

At root, it would appear that Hakemian has disguised his claim as a substantive due process violation to avoid the hurdles that *Parrott v. Taylor,* 451 U.S. 527, 101 S.Ct.1908, 68 L.Ed.2d 420 (1981) (overruled in part, not relevant here, by *Daniels v. Williams,* 474 U.S. 327, 330-31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)), and its progeny pose to procedural due process claims. Unfortunately for Hakemian, the Seventh Circuit has expressly recognized that a plaintiff should not be able to circumvent the reasoning of *Parrott* and disguise insufficient procedural due process claims, alleging a deprivation of a state-created property interest, as substantive due process claims. *Kauth,* 852 F.2d at 957. When properly viewed as procedural due process claims, Hakemian's claims must fail.

In *Parrott,* the Supreme Court stated that nothing in the Fourteenth Amendment protects against all deprivations of life, liberty or property occasioned by the state. 451 U.S. at 537, 101 S.Ct. at 1914. Where a deprivation occurs as a result of an established state procedure, due process typical-

ly requires adequate predeprivation notice and an opportunity to be heard, since under such circumstances a state may predict when a deprivation will occur and is therefore able to institute procedural protections prior to any deprivation. *Id.* at 537–38, 101 S.Ct. at 1914 (citing *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Where, however, the deprivation is not the result of an established state procedure, the state cannot always predict when the deprivation will occur. For example, random and unauthorized acts of state officials do not offer an opportunity for a predeprivation hearing. For that reason, the Court in *Parrott* held that procedural due process is satisfied so long as the state provides adequate post deprivation remedies. *Id.* 451 U.S. at 543–44, 101 S.Ct. at 1917.

Three years later, the Court extended *Parrott* to include intentional deprivations of property. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984). The facts of *Hudson* usefully coincide with the fact of this case. A prisoner alleged that a prison guard had conducted a shakedown search of his cell, brought false disciplinary charges against him, and intentionally destroyed his property solely to harass him. *Id.* at 520, 104 S.Ct. at 3197. The Court held that such conduct was not a violation of procedural due process because the state provided the prisoner with adequate state remedies. *Id.* at 537, 104 S.Ct. at 3205.

Hakemian's claim is similar in that he alleges that Koefoed's acts were intentional and done for the purpose of harassment. Hakemian, however, has failed to allege that he cannot pursue his claims against Koefoed under the Illinois tort system. A claim for malicious prosecution would appear to cover the improper investigation, and defamation seemingly covers the false statements. Nor has Hakemian suggested the remedies provided by the State of Illinois are inadequate. The Supreme Court has explicitly stated that, "although the state remedies may not provide [the plaintiff] with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the

state remedies are not adequate to satisfy the requirements of due process." *Parrott*, 451 U.S. at 544, 101 S.Ct. at 1917. Therefore, Hakemian's allegations do not satisfy even the requirements of a procedural due process violation.

### B. Equal Protection (Count II)

■ Hakemian charges that Koefoed used his authority as an official of the State of Illinois in a discriminatory manner, and treated Hakemian differently than other substantially similarly situated parties in violation of his equal protection rights. Hakemian's equal protection claim fails because the equal protection clause is not violated simply because an individual is singled out for disparate treatment. In order to assert an equal protection claim, a plaintiff must allege that such treatment is based on his membership in a particular group. *New Burnham Prairie Homes*, 910 F.2d at 1481 (discrimination based on individual reasons will not suffice). The complaint contains nothing to suggest that Koefoed's behavior was based on Hakemian's membership in any identifiable group. To the contrary, plaintiff's whole theory is that Koefoed's activities were motivated by a "personal vendetta" and a plot to "bring Sam Hakemian down." [10] In response, Hakemian states that Koefoed "singled out plaintiff Hakemian to suffer an entirely personal vendetta" and that the defendant's actions were "motivated by a personal dislike of plaintiff." These are hardly the type of allegations necessary to sustain an equal protection claim. Accordingly, the defendant's motion to dismiss the equal protection count is granted.

### III. CONCLUSION

For the reasons as set forth above, we grant Koefoed's motion to dismiss the complaint. It is so ordered.

_____

10. Hakemian believes that one of Koefoed's primary motivations was to prevent him from acquiring Prestige so that Koefoed could become its president, a position he could not occupy if Hakemian was the owner. (Complaint ¶ 20).