WILLIAMS, Circuit Judge,
dissenting:
Were we deciding this case on a clean slate, I would agree with almost everything my colleagues in the majority have written. As it stands, however, I believe that we are constrained by circuit precedents, namely Plumer v. State of Maryland, 915 F.2d 927 (4th Cir.1990), and Fields v. Durham, 909 F.2d 94 (4th Cir.1990), to interpret Zinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), as having had a greater impact on this area of law than that ascribed to it by the majority. Accordingly, I respectfully dissent.
*564 I begin with the premise that Zinermon is in tension with Parrott v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). See Easter House v. Felder, 910 F.2d 1387, 1408-09 (7th Cir.1990) (en banc) (Easter-brook, J., concurring). Indeed, as predicted by Justice O’Connor in her dissent in Zinermon, the two lines of eases have created confusion in the lower federal courts. Zinermon, 494 U.S. at 150, 110 S.Ct. 975 (O’Connor, J., dissenting); see Jose R. Juarez, Jr., The Supreme Court as the Cheshire Cat: Escaping the Section 1983 Wonderland, 25 St. Mary’s L.J. 1, 30 tbl. 1 (1993) (describing both inter- and intra-circuit splits in the application of Zinermon.) [hereinafter Juarez], The inconsistency in these cases has its root in two competing views of the proper scope of § 1983 liability.
Scholars have named these two competing visions of § 1983 liability the “legalist” model and the “governmental” model. Larry Alexander, Constitutional Torts, the Supreme Court, and the Law of Noncontradiction: An Essay on Zinermon v. Burch, 87 Nw. U.L.Rev. 576, 576-77 (1993) [hereinafter Alexander]; see also Juarez, 25 St. Mary’s L.J. at 7-12. The legalist model is typified by Hudson; and under this view, § 1983 imposes liability only if state lawmakers endorse a constitutional violation. See Hudson, 468 U.S. at 533, 104 S.Ct. 3194; see also Monroe v. Pape, 365 U.S. 167, 202, 237-47, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (Frankfurter, J., dissenting) (urging application of the legalist model to determine whether a constitutional violation occurs “under color of’ state law for purposes of § 1983); cf. Barney v. City of New York, 193 U.S. 430, 438, 24 S.Ct. 502, 48 L.Ed. 737 (1904) (applying the legalist model in determining what constitutes “state action” under the Fourteenth Amendment). In other words, under the legalist model, no § 1983 liability obtains if a governmental actor violates state law when committing a constitutional violation, unless the state fails to provide a post-violation remedy. In contrast, under the governmental model, which is typified by Monroe v. Pape, § 1983 imposes liability for all constitutional violations committed by governmental actors in the scope of their employment — even if the actor violates state law when committing the violation. See Monroe, 365 U.S. at 183-87, 81 S.Ct. 473 (applying the governmental model to determine whether a constitutional violation occurs “under color of’ state law for purposes of § 1983); cf. Home Tel. & Tel. Co. v. City of Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913) (applying the governmental model in determining what constitutes “state action” under the Fourteenth Amendment). The Court has vacillated between these two competing viewpoints for almost one hundred years.
The only obvious reason for the different approaches used in Monroe and Hudson is the location of the Constitutional right asserted by the plaintiff. In Monroe, 365 U.S. at 171, 81 S.Ct. 473, the plaintiff asserted a violation of the Fourth Amendment, whereas in Hudson, 468 U.S. at 530, 104 S.Ct. 3194, the plaintiff alleged a violation of the Due Process Clause. Thus, before Zinermon, the mission of lower courts was relatively clear — apply the le-galist model to procedural due process claims and apply the governmental model to other constitutional violations committed by state actors.
If the Court had followed Hudson and used the legalist model in Zinermon, it would have been an easy case — according to the complaint, the state actors in that case committed the plaintiff to a mental institution in willful violation of Florida’s procedural requirements. Zinermon, 494 *565 U.S. at 121, 110 S.Ct. 975 (“Defendants ... knew or should have known that Plaintiff was incapable of voluntary, knowing, understanding and informed consent to admission and treatment.... Nonetheless, Defendants ... seized Plaintiff and against Plaintiffs will confined and imprisoned him and subjected him to involuntary commitment and treatment.... Plaintiff was without the benefit of counsel and no hearing of any sort was held at which he could have challenged his involuntary admission and treatment.”); id. at 122-23, 110 S.Ct. 975 (describing the extensive procedures mandated by Florida law prior to involuntary commitment). Under the reasoning of Hudson, the actions taken by the Ziner-mon defendants were “random and unauthorized,” and the state could not have foreseen its employees’ failure to comply with the established state procedures. Hudson, 468 U.S. at 533, 104 S.Ct. 3194. Thus “the state’s action” would not have been “complete until and unless it provide[d] or refuse[d] to provide a suitable postdeprivation remedy.” Id.
Similarly, if the Court had overruled Hudson and adopted the governmental model for procedural due process claims, Zinermon would, again, have been an easy case — a state employee acting within the scope of his employment deprived the plaintiff of his liberty, without the prede-privation hearing to which the Constitution entitled him. Under the reasoning of Monroe, the state officials acted under col- or of state law when they deprived the plaintiff of his liberty without a hearing, and the plaintiff thus would have been entitled to bring a § 1983 claim in federal court.
Rather than choosing between the two competing models, however, the Supreme Court, in a rather vague opinion, used language indicating its adherence to both models. Zinermon, 494 U.S. at 136-38, 110 S.Ct. 975. Although Zinermon relied on Monroe, the paradigmatic example of the governmental model of § 1983 liability, and clearly retreated from the legalist model, for whatever reason, the Court did not overrule Hudson. Zinermon, 494 U.S. at 135, 110 S.Ct. 975 (“It is immaterial whether the due process violation Burch alleges ... aris[es] from petitioners’ failure to comply with state procedures for admitting involuntary patients.”); Alexander, 87 Nw. U.L.R. at 587.
Thus, when we decided Fields and Plu-mer, we were faced with a line of Supreme Court precedents that resembles, as Judge Easterbrook has colorfully described, “the path of a drunken sailor.” Easter House, 910 F.2d at 1409 (Easterbrook, J., concurring); see also Alexander, 87 Nw. U. L.R. at 596 (“It is not an overstatement to describe the Supreme Court’s constitutional torts jurisprudence as a welter of confusion, leaving litigants and lower courts completely at sea.”). Lower courts were, it seemed, free to chose whichever model they preferred by reading Zinermon narrowly or broadly. In Plumer and Fields, we interpreted Zinermon broadly, concluding that the Court had adopted the governmental model of determining liability for procedural due process claims under § 1983. Plumer, 915 F.2d at 930-31; see also Juarez, 25 St. Mary’s L.J. at 36 & app. 1 (“The United States Court of Appeals for the Fourth Circuit has consistently followed the [governmental Model.”). Although other circuits narrowly read Zinermon in order to retain the le-galist model typified by Hudson, see Caine v. Hardy, 943 F.2d 1406, 1413 (5th Cir.1991) (en banc) [Caine II ]; Easter House, 910 F.2d at 1400-02, we rejected that approach. Plumer, 915 F.2d at 930-31(citing Caine v. Hardy, 905 F.2d 858, 862 (5th Cir.1990) overruled en banc by Caine II, 943 F.2d 1406); cf. Easter House, 910 F.2d at 1400 (“[W]e note that the phrase *566 ‘random and unauthorized’, as it has been employed since the decision in Parratt, can be interpreted both narrowly and broadly.”). The courts that narrowly-read Zin-ermon focus on whether the state has granted broad discretion to its employees in carrying out their duties to determine whether a case is covered by Zinermon. See, e.g., Easter House, 910 F.2d at 1401 (“Although the appellants did exercise a certain amount of discretion and authority over the failure or success of renewal applications, that discretion was not ‘uncir-eumscribed’ or otherwise unregulated.”). As no state gives its employees discretion to violate state law, however, the violation of sta,te procedural rules means that Par-mii/Hudson applies and no § 1983 liability exists for.the failure to comply with the existing state, procedures. The majority essentially follows this approach today. See ante at 562.
Under Plumer, however, the Par-raii/Hudson doctrine does not apply when “erroneous ... deprivation^ are] foreseeable” and “pre-deprivation procedures are practicable.” Plumer, 915 F.2d at 931. Moreover, when a state implements prede-privation procedural safeguards, it demonstrates both that predeprivation procedures are practicable and that erroneous deprivations are foreseeable. Id.; Fields, 909 F.2d at 97 (“We believe that th[e] risk was foreseeable, and that [the state] acted to address it by prescribing predeprivation procedures to ensure that [erroneous deprivations did not occur].”). We only look to the adequacy of postdeprivation process when it “truly is impossible” for the state to provide predeprivation procedures “before a person unpredictably is deprived of his liberty or property through the unauthorized conduct of a state actor.” Plu-mer, 915 F.2d at 930. Under Plumer, the very fact that governmental actors failed to comply with an established state procedural scheme before depriving someone of her property “indicate[s] ... the inapplicability of Parratt ” — regardless of whether the actor is vested with broad discretion by the procedural scheme. Plumer, 915 F.2d at 931; Fields, 909 F.2d at 97. “In short, when a state government can and does provide a predeprivation hearing and charges its employees with effecting the deprivation complained of, the availability of an adequate state postdeprivation remedy does not, standing alone, satisfy the Due Process Clause.” Plumer, 915 F.2d at 931. Thus, if the Constitution requires predeprivation procedures, it is no defense to § 1983 liability that state law establishes the requisite predeprivation procedures, if those procedures were not used in a given case.
For example, in Fields, school officials were accused of firing a tenured professor without following the pretermination procedures required by state law. Fields, 909 F.2d at 96-97. Even though the officials had not followed the letter of state law, they had provided the professor with some pretermination process. The officials had no discretionary authority not to follow the constitutionally adequate procedures established by state law, but we nonetheless held that Parratt was inapplicable. Id. Although we concluded that the pretermin-ation procedures actually afforded the professor sufficed to satisfy due process under Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), had they been inadequate, liability would have attached. Fields, 909 F.2d at 96-97.
We also applied the governmental model of liability in Plumer. To paraphrase Plu-mer in the factual context of this case:
[T]he risk of an erroneous [animal forfeiture] clearly was foreseeable. Indeed, [South Carolina] surely realizes that for it has developed procedural safeguards to protect against erroneous depriva *567 tions. When utilized, the procedures established by [South Carolina] to ensure correct [animal forfeitures] have significant value in guarding against any erroneous deprivations. But the fact that the predeprivation procedures are practicable indicates, as in Zinermon, the inapplicability of Parratt
Plumer, 91S F.2d at 931; see also Fields, 909 F.2d at 97 (“[W]e first ask whether the risk of an erroneous deprivation was foreseeable.”).[1]
South Carolina has established a detailed procedural s'cheme governing the seizure and care of cruelly-treated and neglected animals. See S.C.Code Ann. §§ 47-1-120, -140, -150, -170 (Law. Coop.1987 & Supp.2003). That scheme provides two different methods for the seizure of animals. Animals may be seized during the course of an arrest for animal cruelty or pursuant to a warrant issued by a magistrate.[2] See id. §§ 47-1-120, -150(C). Regardless of the method employed to seize an. animal, the owner is entitled to either criminal or civil process before forfeiting the animal. Id. §§ 47-l-150(F), - 170. Clearly, South Carolina’s procedural scheme is constitutionally sufficient — it provides for predeprivation notice and hearing, and Bogart has not argued that the Constitution requires more. See Mathews, 424 at 333, 96 S.Ct. 893. But that simply is not the end of our inquiry under the governmental model of liability *568 that we have adopted. We must also examine, as we did in Fields and Plumer, the predeprivation process actually afforded Bogart in this case. If that process was inadequate, the state officials who deprived her of her property are liable under § 1983 — -just as they would be for executing a search or an arrest without a warrant.
The procedures actually afforded Bogart in this case were not constitutionally sufficient. As the majority notes, the Constitution generally requires a pre-deprivation hearing before the destruction of one’s animals. Mathews, 424 U.S. at 333, 96 S.Ct. 893; see Nicchia v. New York, 254 U.S. 228, 230, 41 S.Ct. 103, 65 L.Ed. 235 (1920). Thus, if a state procedural scheme provided for the summary killing of all seized animals, the scheme would be patently unconstitutional. Here, unlike the professor in Fields, Bogart undisputedly received no predeprivation process at all. Her animals were summarily killed after being seized by the very officials responsible for initiating the statutory hearing under South Carolina law, S.C.Code Ann. §§ 4T — 1—150(C), (D) (Law.Co-op.Supp. 2004). It follows that because Bogart did not receive the process she was constitutionally due before the destruction of her animals, she is entitled to maintain a § 1983 claim notwithstanding the availability of adequate postdeprivation state tort remedies.
If this were a case of first impression, I would follow the legalist model typified by Hudson and read Zinermon narrowly, as do several of our sister circuits. Justice Holmes strongly defended the legalist model in his dissent from Raymond v. Chicago Union Traction Co., 207 U.S. 20, 41, 28 S.Ct. 7, 52 L.Ed. 78 (1907) (“I am unable to grasp the principle on which the state is said to deprive the appellee of its property without due process of law because a subordinate ..., subject to the control of the supreme court of the state, is said to have violated the express requirement of the state in its Constitution.”), as did Justice Frankfurter in his dissent from Monroe, 365 U.S. at 237, 81 S.Ct. 473 (“The jurisdiction which Article III of the Constitution conferred on the national judiciary reflected the assumption that the state courts, not the federal courts, would remain the primary guardians of that fundamental security of person and property which the long evolution of the common law had secured to one individual as against other individuals. The Fourteenth Amendment did not alter this basic aspect of our federalism.”). I find the arguments of these notable jurists persuasive.
Unfortunately, we are bound by the broad interpretation of Zinermon contained in Plumer and Fields. Thus, although I agree that the majority’s interpretation of Zinermon is the preferable one, and perhaps even “the best estimate of the course a majority of the [Supreme] Court will take” to resolve the “[¡Inconsistent lines of precedent,” Easter House, 910 F.2d at 1409 (Easterbrook, J., concurring), I believe that we, as a panel, should refrain from muddying the clear law of this circuit by adding to our body of precedents an opinion that relies upon the legalist model. By doing so today, the majority creates an inconsistent line of precedents in our circuit. If we wish to follow the narrow interpretation of Zinermon used in the Fifth and Seventh Circuits, we must first overrule Plumer and Fields in an en banc session. Because we have not done so, I would reverse the district court and allow Bogart to proceed with her procedural due process claim. Accordingly, I respectfully dissent.

. The majority holds that “the Defendants’ euthanization of Bogart’s animals is properly characterized as unauthorized....” Ante at 562. Because the Defendants’ actions were "foreseeable” as that term is used in our precedents, and predeprivation procedures were practicable, I need not decide whether the Defendants' actions were also "unauthorized.” See Plumer v. State of Maryland, 915 F.2d 927, 931 (4th Cir.1990) ("|T]He fact that the predeprivation procedures are practicable indicate ... the inapplicability of Parratt."); Fields v. Durham, 909 F.2d 94, 97 (4th Cir.1990) (”[W]e first ask whether the risk of an erroneous deprivation was foreseeable.”). I note, however, that under Plumer, "the conduct of ... state employees ... [i]s not unauthorized’ [if] the state has delegated to its employees 'the power and authority to effect the very deprivation complained of ... and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law....” Plumer v. State of Maryland, 915 F.2d 927, 931 (4th Cir.1990). In this case, the animal control officers who seized Bogart's animals are the ones who ultimately would be charged with making a "humane disposition” of the animals if Bogart was adjudicated unable to care for them. S.C.Code Ann. § 47-l-150(F)(2). They were also charged with ”petition[ing] the magistrate or municipal judge of the county or municipality wherein the animal [wa]s found for a hearing” immediately after the seizure. S.C.Code Arm. § 47-l-150(H). Given these requirements, it seems clear that South Carolina "has delegated to [the Defendants] the power and authority to effect” euthanizations and also the "concomitant duty to initiate the procedural requirements set up by” South Carolina law. Plumer, 915 F.2d at 931.

. I note that in the district court, and in its initial brief on appeal, the County argued that it seized Bogart’s animals pursuant to the civil warrant provisions of S.C.Code Ann. § 47-1-150 (Law.Co-op.Supp.2004). (J.A. at 304 ("South Carolina ... passed ... 47-1-150.... And they set out ... specific state . law procedures to govern in cases such as this.... [S]ubsection B [of 47-1-150] provides for certain due process rights, provides for a hearing before a magistrate, [and] it provides for notice to be given.”); J.A. at 309 (”[W]hat [Bogart is] talking about obviously is 47-1-150.”); Appellee’s Br. at 17 (citing § 47-1-150).) This position corresponds with the facts of the case, given that Officer Mabry obtained a. warrant as required by section 47-1-150 and that the defendants began seizing animals well before Bogart was arrested for animal cruelty. (J.A. at 157.) The County, however, switched course in its supplemental brief and argued that the animals were seized pursuant to section 47-1-120 incident to Bogart’s arrest for animal cruelty. As discussed, infra, under either statutory provision, Bogart was entitled to a hearing before forfeiting her animals. §§ 47-l-150(F), -170.